DECISION
Before this Court is an appeal by Aaron R. Sherman, M.D. ("Dr. Sherman") from a decision and order of the Rhode Island Board of Medical Licensure and Discipline ("Board"). After several hearings conducted from July 1, 2004 to February 8, 2006, the Board found Dr. Sherman guilty of five counts of "unprofessional conduct" in violation of G.L. 1956 § 5-37-5.1. The Board issued a reprimand relative to Dr. Sherman's license to practice medicine and conditioned his license on his adherence to any recommendations made by the Physicians Health Committee. This Court has jurisdiction pursuant to G.L. 1956 § 42-35-15.
 I Facts and Travel
On March 25, 2004, the Board charged Dr. Sherman with sixteen counts[1] of unprofessional conduct within the meaning of § 5-37-5.1. (State's Ex. 3.) Count One alleged that Dr. Sherman administered Benzodiazepine to Patient A without warning and without her knowledge or consent and that Dr. Sherman gave false information to the *Page 2 
Board by denying that he had administered the drug.[2] Count Two alleged, inter alia, that Dr. Sherman administered Benzodiazepine to Patient A, and she lost consciousness for approximately thirty minutes in a partially nude state on an examination table.[3] Count Three alleged, inter alia, that Dr. Sherman did not disclose to Patient A that the drug had been administered and did not explain its presence in her system and its relationship to her fainting. Count Three also alleged that Dr. Sherman did not initially tell Patient A why she had to be taken to the hospital, or explain to the hospital's physicians why *Page 3 
Patient A had fainted and lost consciousness.[4] Count Four alleged that Dr. Sherman did not record the procedures he performed on Patient A in her medical records, making the medical records a false record of treatment.[5] Count Five alleged, interalia, that Dr. Sherman paid Patient A as part of a settlement after she sued him for malpractice.[6]
Rhode Island's Director of Health appointed a three-member hearing committee ("Hearing Committee") to adjudicate Dr. Sherman's case. From July 1, 2004 to February 8, 2006, a hearing officer, Attorney Maureen Hobson ("Hearing Officer"), conducted several hearings pursuant to G.L. 1956 § 5-37-5.2. Of the sixteen counts, Dr. Sherman *Page 4 
was found guilty on Counts One through Five, all of which involved his treatment of Patient A on September 21, 1994. The following is a synopsis of the testimony and evidence that were elicited at the hearings with respect to Dr. Sherman's treatment of Patient A on September 21, 1994.
 A Testimony of Dr. Sherman at the July 1, 2004 Hearing
In 1994, Dr. Sherman was an obstetrician/gynecologist licensed to practice medicine in Rhode Island. On September 21, 1994, Patient A came to Dr. Sherman's office for a follow up visit relative to a prior diagnosis of cysts. (Tr. at 79.) During this visit, Dr. Sherman collected urine/vaginal cultures using a speculum, performed a bi-manual internal examination, and an ultrasound on Patient A. (Tr. at 80, 83, 89.) While performing the bi-manual examination of the right ovary, Patient A said that she felt dizzy. (Tr. at 84.) Patient A had been lying down on an electric examination chair, and Dr. Sherman sat her up because he did not want blood rushing to her head. (Tr. at 84.) After he thought that she appeared "okay," he performed the ultrasound. (Tr. at 85.) Dr. Sherman noted that Patient A had had a "vasovagal reaction."[7] He denied that Patient A *Page 5 
suffered a ruptured cyst during his examination. (Tr. at 89.) Dr. Sherman noticed fluid in the cul-de-sac, causing him to question whether Patient A had a ruptured cyst or whether the fluid was from the exam, but he did not question whether he had ruptured a cyst. (Tr. at 96; State's Ex. 11.) After Patient A's vasovagal reaction, she had a prolonged "post-ictal state," which Dr. Sherman described[8] as confusion people experience after a vasovagal reaction. (Tr. at 80-81.) After the ultrasound was completed, Patient A remained confused. (Tr. at 85.) Dr. Sherman did not recall any loss of consciousness. (Tr. at 94.) Dr. Sherman called the emergency room at Kent County Memorial Hospital, and Dr. Mello at the emergency room offered to see Patient A, but Patient A said that she would rather go home with a friend. (Tr. at 81, 85.) After Patient A declined to go to the emergency room, Dr. Sherman continued to see other patients. (Tr. at 85-86.)
Later that day, Dr. Sherman received word from his office staff that Patient A was in the emergency room at the Kent County Memorial Hospital under the care of Dr. Riedel. Dr. Sherman, who had been at the hospital attending to another patient, spoke with Dr. Riedel, Patient A, and Patient A's sister at the hospital. (Tr. at 87.) Dr. Sherman denied that he ever told Dr. Riedel that he had administered Valium to Patient A. (Tr. 88.)
Dr. Sherman testified that before doing the bi-manual examination and ultrasound, he did a speculum examination and obtained cultures, but maintained that the vasovagal reaction occurred during the bi-manual examination. (Tr. at 89-90.) Counsel for the Department of Health ("Department") asked Dr. Sherman about a letter that the Board required him to write concerning his care of Patient A. The letter, dated *Page 6 
September 19, 2002, stated: "[I] performed an internal pelvic examination, including obtaining cultures with a sterile swab. Then I attempted to perform an ultrasound examination. When pressure was exerted on the area of [Patient A]'s ovaries, she informed me she felt faint." (Tr. at 100-01; Ex. State's 12.) The Department's counsel noted that Dr. Sherman had recently testified that the vasovagal reaction had occurred during the bi-manual exam, and in the letter he asserted that it had occurred during the ultrasound exam. Dr. Sherman explained that he had "put the sentences in the wrong order," and that she had, in fact, experienced the vasovagal reaction during the bi-manual exam. (Tr. at 102.)
Dr. Sherman testified that he did not inject or administer Benzodiazepam [sic] in any way to Patient A. (Tr. at 106.) When asked whether he told any of the doctors at the hospital that he gave Patient A Valium, Dr. Sherman responded, "No, I don't believe so." (Tr. at 106.) He denied having ever given Valium to a patient in his office or even storing Valium in his office. (Tr. at 106.) He denied using Benzodiazepam or Versed in his practice. (Tr. at 107.)
 B Testimony of Patient A at the August 25, 2004 and September 22, 2004 Hearings
Patient A became a patient of Dr. Sherman in February or March of 1994 when she became pregnant. (Tr. at 44-45, 8/25/04.) On September 21, 1994, Patient A went to see Dr. Sherman because she believed that her bladder was infected again. (Tr. at 45, 8/25/04.) Dr. Sherman told her that he "was going to do that swab thing" and a probe ultrasound. (Tr. at 47, 8/25/04.) During the internal examination, Dr. Sherman began to use a long cotton swab when she "felt a pinch" in her vagina. (Tr. at 47, 8/25/04.) She *Page 7 
felt the pinch only seconds after she felt Dr. Sherman insert the speculum. (Tr. at 6, 9/22/04.) She testified, "The only thing that I saw him put in his hands, I don't know the technical term for the swab itself, but it's the long swab with the cotton. . . . Whatever he did underneath or whatever he had in his hands underneath I could not see." (Tr. at 83, 8/25/04.) At no time did she ever see a syringe in Dr. Sherman's hands prior to or after feeling a pinch. (Tr. at 9-10, 9/22/04.) After Patient A responded audibly[9] to the pinch, Dr. Sherman explained that he had accidentally ruptured a cyst when he was using the swab. (Tr. at 47, 8/25/04.) After about sixty to ninety seconds, Patient A felt extremely tired and told Dr. Sherman that she felt groggy and that she might pass out. (Tr. at 47-48, 8/25/04.) Dr. Sherman sat Patient A up in the chair, and explained that when a cyst erupts, it secretes a fluid like morphine that would cause such feelings, but that it would wear off in about fifteen minutes. (Tr. at 48, 8/25/04; Tr. at 16, 9/22/04.) Dr. Sherman said that he would continue to do the ultrasound probe; he put the chair back and Patient A "was out." (Tr. 48, 8/25/04; Tr. at 14, 9/22/04.) Patient A testified that because there was a clock directly in front of her, when she woke up, she noticed that it was about 9:34. (Tr. at 48, 8/25/04.) On cross-examination, however, Patient A testified that it was about 9:25 when she regained consciousness. (Tr. at 17, 9/22/04.) The examination began about two minutes after 9:00. (Tr. at 46-47, 8/25/04.) Dr. Sherman told her that she had been out for about half an hour. (Tr. at 13, 9/22/04.)
When Patient A awoke, she was in the room alone with Dr. Sherman. Dr. Sherman told Patient A that she could wait in the room until she felt better, and he left the room. (Tr. at 48, 8/25/04.) A nurse came into the room and offered Patient A water, which she declined. Dr. Sherman came back into the room and asked Patient A if she felt *Page 8 
she could drive home, but Patient A said she was scared to drive because of her fatigue. (Tr. at 49, 8/25/04.) Patient A told Dr. Sherman that she felt a pain in her neck similar to the time that she was given Compazine and had an allergic reaction. (Tr. at 49, 8/25/04; Tr. at 18, 9/22/04.) Dr. Sherman told her that it might be a side effect from the ruptured cyst and called the emergency room doctor at Kent County Memorial Hospital. (Tr. at 49, 8/25/04.) He explained how Patient A had passed out after he had ruptured a cyst, and that she now felt a pain in her neck. Dr. Sherman informed Patient A that the emergency room doctor agreed that those were symptoms of a ruptured cyst. (Tr. at 50, 8/25/04.) Dr. Sherman did not suggest that she should go to the emergency room. (Tr. at 17, 9/22/04.)
Dr. Sherman told Patient A that she would have to leave the room and that she could go into the waiting room to call someone to pick her up. Patient A's friend came to the office to pick her up and take her back to his mother's house. While she was resting, her friend's aunt and uncle went to check on Patient A and believed that she was having a seizure. (Tr. at 52, 8/25/04.) They called 911. (Tr. at 52, 8/25/04.) An ambulance came to her friend's mother's house and took her to Kent County Memorial Hospital. (Tr. at 52, 8/25/04.) While she was in the ambulance, she was given an IV. (Tr. at 61, 8/25/04.) In the emergency room, she was examined by Dr. Riedel. (Tr. at 53, 8/25/04.) Patient A did not talk to Dr. Sherman at the hospital, but Dr. Sherman spoke with Dr. Riedel. (Tr. at 20, 9/22/04.) Dr. Sherman did not examine Patient A at the hospital. (Tr. at 22, 9/22/04.) At the emergency room, Patient A's preliminary urine test returned positive for benzodiazepines. (State's Ex. 13.) Patient A was admitted to the hospital overnight. (Tr. at 54, 58, 8/25/04.) When asked if she had taken any drugs before that time, Patient A *Page 9 
responded that Advil was the extent of her drug use. (Tr. at 56, 8/25/04.) She denied that she had ever taken benzodiazepines. (Tr. at 56, 8/25/04.)
Subsequently, Patient A's attorney sent a letter to Dr. Sherman, claiming that it was Dr. Sherman who escorted her to the examination room and asked her to remove her clothing. Patient A, however, testified at the hearing that the receptionist performed those tasks. (Tr. at 74, 8/25/04; see Respondent's Ex. B.) Patient A explained, "[A]ll the revisions that I had pointed out to [my attorney] aren't corrected in this one, so maybe you have or maybe [Dr. Sherman] was sent the unrevised letter because I can tell you several things in here that I pointed out to [my attorney] that needed to be revised." (Tr. at 75, 8/25/04.) In Patient A's answers to Dr. Sherman's interrogatories in a separate suit, she again made the claim that it was Dr. Sherman who requested that she remove her clothing from the waist down. (Respondent's Ex. C.) Patient A clarified that the female who asked her to remove her clothing "was standing in front of Dr. Sherman who [Patient A] said was in the hallway when they opened up the door to let [her] into the [examination] room." (Tr. at 81, 8/25/04.)
 C Testimony ofDr. Riedel at the October 12, 2004 Hearing
Dr. Riedel was one of the emergency room physicians working at Kent County Memorial Hospital on September 21, 1994 when Patient A was brought by ambulance to the emergency room. (Tr. at 4.) On direct examination by the Department's counsel, he testified that he ordered a toxicology screen on Patient A's urine, a panel of blood tests, a blood gas, a blood alcohol test, and a CT scan of Patient A's head. (Tr. at 6.) The toxicology screen came back positive for benzodiazepines. (Tr. at 6; State's Ex. 13.) *Page 10 
Patient A was surprised to learn of this test result. (Tr. at 6.) Dr. Riedel further testified that he called Dr. Sherman and asked him about the benzodiazepines in Patient A's urine. Dr. Sherman replied that "he had given it to her." (Tr. at 7.) Dr. Sherman did not explain how he administered it to Patient A, nor how much he had given her. (Tr. at 7, 30.) Another doctor, Dr. Sehl, admitted Patient A to the hospital so that she could stay overnight. (Tr. at 9.) Dr. Riedel explained that emergency room physicians in Rhode Island do not have admission privileges. (Tr. at 9.) Dr. Riedel did not note that Dr. Sherman had given Patient A benzodiazepines in Patient A's chart. (Tr. at 17.) When asked what Dr. Sherman's explanation was for administering Valium to Patient A, Dr. Riedel stated "[because] she was very upset and hysterical and he needed to give it to her." (Tr. at 25-26.)
On cross-examination, Dr. Riedel testified that he made three provisional diagnoses regarding Patient A: (1) ruptured ovarian cyst; (2) vasovagal episode; and (3) situational adjustment.[10]
(Tr. at 14.) None of the provisional diagnoses related to an interaction with Valium. (Tr. at 26.) As far as his first diagnosis, Dr. Riedel stated that "it was [his] understanding after talking with Dr. Sherman that — to the best of [his] memory that during the exam she was in sufficient pain and the exam was sufficiently positive for diagnosis of ruptured ovarian cyst made clinically." (Tr. at 14.) Dr. Riedel wrote in his chart, "Dr. Sherman gave. . . ." leaving the sentence unfinished. (Tr. at 17, *Page 11 
State's Ex. 13.) Dr. Riedel explained his decision not to write about Valium in Patient's A's chart:
 As far as I can see, in this case the plain issue was the patient was very upset even to the point of being a little hysterical and then there were some unanswered questions about seizures, there were some questions about her psychiatric state, there was some confusion about just what had happened. I think the main issue is we didn't really know what had happened. Whether medicine such as Valium was given in my mind was not appropriate — was not the most important issue here. Even though I fully believe that she had gotten it and I think we understood how and when she got it, I think that that didn't answer all the questions that in my mind were the really important ones. (Tr. at 18-19.)
 D Testimony ofDr. Sehl at the October 22, 2004 Hearing
Dr. Sehl admitted Patient A to Kent County Memorial Hospital on September 21, 1994. (Tr. at 5.) He recalled that Patient A had had a syncope and was seen in the emergency room by Dr. Riedel. Dr. Sehl took Patient A's history and made a note in the progress notes on September 21, 1994, that Patient A "received Valium from Dr. Sherman today." (Tr. at 7; State's Ex. 13.) Dr. Sehl had no recollection of who told him that Dr. Sherman had given Valium to Patient A. (Tr. at 7, 17.) In Patient A's Discharge Summary, dictated on September 22, 2004, Dr. Sehl stated that "[t]here was some question about whether Dr. Sherman gave the patient an injection of Valium prior to the patient being brought to the hospital." (Tr. at 8-9, 11; State's Ex. 13.) Dr. Sehl indicated that there was a question, rather than stating with certainty that Dr. Sherman had given Patient A Valium, because he was not sure what happened. (Tr. at 12.) Dr. Sehl's dictated medical chart history for Patient A was dictated on October 3, 1994. (State's Ex. 13.) *Page 12 
He testified that he dictated the notes by looking at the progress notes. (Tr. at 10.) The dictated medical chart history reads, "[Patient A] states she received Valium today from Dr. Sherman. . . ." (State's Ex. 13.) In Patient A's Discharge Summary, Dr. Sehl wrote that Patient A's discharge diagnosis was vasovagal syncope. (Tr. at 13; State's Ex. 13.) Dr. Sehl did not write down that Patient A lost consciousness from the Valium because he did not think that the Valium caused Patient A to lose consciousness. (Tr. at 13-14.) Dr. Sehl testified that in his opinion, it was very unlikely that the syncope episode would result from Valium. (Tr. at 20-21.) Also, on Patient A's "face sheet," Dr. Sehl's final diagnosis explaining admission was "vasovagal syncope." (Tr. at 15-16; State's Ex. 13.) The "face sheet" contained a secondary diagnosis of "syncope due to blood loss." (Tr. at 16; State's Ex. 13.)
 E Testimony ofDr. Burt at the December 29, 2004 Hearing
Dr. Sherman's counsel called Dr. Burt, an anesthesiologist with over twenty-five years experience with the use of Valium. (Tr. at 26.) First, Dr. Burt testified with a high degree of medical certainty that Valium does not cause seizures, but rather is used to prevent or stop seizures. (Tr. at 27-28.) Next, Dr. Burt was asked to assume that a patient had been injected in the vagina with Valium. He was asked how long after such injection it would take for the patient to feel dizziness, unconsciousness, or lack of awareness of surroundings. (Tr. at 29.) Dr. Burt answered that an injection into the vagina would be intramucosal[11] or intramuscular, [12]
as opposed to intravenous, [13] and that, *Page 13 
as such, it would take a relatively long period of time to absorb into the blood. (Tr. at 30.) Also, it would depend on the amount of Valium given: the more Valium given, the faster the reaction. (Tr. at 30.) Dr. Burt noted that an injection of Valium in the vagina would be very painful, and, because it is such a viscous fluid, it would take a long time to inject. (Tr. at 30-31.) Dr. Burt testified that, if a patient were administered a relatively large quantity, it would take approximately twenty to thirty minutes for an adult person to feel drowsiness or sedation. (Tr. at 31.) Dr. Burt testified that it would take twenty to thirty milligrams — Valium comes in ten milligram vials — to achieve absorption and drowsiness within twenty to thirty minutes. (Tr. at 32.) It could be administered in a single injection. (Tr. at 32.) Dr. Burt explained that the pain associated with such a Valium injection would be much more than a pinch: "Giving it in an injection that isn't intravenous into the muscle or into the mucosus [sic] is extremely uncomfortable and you would only do that if you had no other route to give it to a patient and you absolutely thought you had to give a patient this medicine." (Tr. at 33.) He testified that Valium is falling out of use because a similar drug, Medazepam, does not cause the burning *Page 14 
sensation, phlebitis, associated when Valium is administered intravenously. (Tr. at 33.) Dr. Burt acknowledged that a toxicology screen would test a patient for benzodiazepines rather than any particular brand name, like Valium. (Tr. at 36.)
 F Testimony of PamelaCross at the December 29, 2004 Hearing
Pamela Cross ("Cross"), Dr. Sherman's office manager from January 1992 to April 1997, testified that she remembers seeing Patient A sitting in the waiting room looking lethargic. (Tr. at 44.) She further testified that she was in charge of ordering supplies and paying the bills for the office, and that she had never ordered Valium or paid for any Valium. (Tr. at 45.) She never saw any Valium in any form in the office. (Tr. at 45.) Cross believed that there was a medical assistant, Jill Keenan, with Dr. Sherman and Patient A during the examination. (Tr. at 46.)
 G Testimony ofDr. Sherman at the December 29, 2004 Hearings
Dr. Sherman denied injecting Patient A with any substance on September 21, 1994. (Tr. at 56, 64, 78.) He also denied giving Patient A Valium. (Tr. at 78-79.) He maintained that he had never had Valium in his office for any reason. (Tr. at 56.) The only time Dr. Sherman said he used Valium in his practice was in the hospital, when he ordered and administered Valium to a patient to treat an acute seizure. (Tr. at 56-57.) He said no valid medical reason existed to ever inject a patient with Valium in the vaginal area. (Tr. at 57-58.)
Dr. Sherman testified that at 8:30 am on September 21, 1994, he was at Kent County Hospital attending to a patient. (Tr. at 59.) He arrived at his office about 9:00 *Page 15 
am. (Tr. at 60.) Dr. Sherman began examining Patient A by placing a speculum[14] into her vagina and using a swab to obtain Chlamydia and gonorrhea cultures. (Tr. at 59, 64.) The speculum was in Patient A for approximately fifteen to thirty seconds. (Tr. at 62.) Dr. Sherman testified that Patient A did not react physically or vocally during any part of the speculum examination, but that she did react during the bi-manual examination.[15] (Tr. at 65.) The bi-manual exam takes less than a minute. (Tr. at 66.) During the bi-manual examination, when Dr. Sherman examined Patient A's right ovary, she stated that she felt some discomfort and her eyes began to roll back. (Tr. at 66.) She became less responsive. (Tr. at 66.) She was no longer vocal and was not responding to Dr. Sherman when he spoke to her. (Tr. at 66-67.) The speculum and bi-manual examination lasted at most a couple of minutes. (Tr. at 67.) Patient A's right ovary felt somewhat cystic, but it was not enlarged. (Tr. at 67.) Dr. Sherman did not recall if anyone was in the examination room with them. (Tr. at 68.)
Dr. Sherman thought that Patient A had experienced a vasovagal reaction[16] and that she might suffer a seizure. (Tr. at 68.) In order to ensure that Patient A's airway was *Page 16 
not blocked by her tongue, Dr. Sherman sat Patient A's chair up. (Tr. at 69.) Dr. Sherman testified that Patient A became conscious rather quickly. (Tr. at 69.) He explained that his "impression was that she was less responsive for at most minutes. I would think it was more like seconds." (Tr. at 69.) Dr. Sherman discussed with Patient A that he thought she had experienced a vasovagal reaction and recommended that she visit the emergency room. (Tr. at 73-74.) Dr. Sherman contacted the emergency room doctor, Dr. Mello, and he agreed that it was probably a vasovagal reaction, but like Dr. Sherman he believed Patient A should visit the emergency room. (Tr. at 73.) Patient A refused to go to the emergency room and chose to have a friend pick her up at Dr. Sherman's office. (Tr. at 74.) Dr. Sherman described what occurred as he waited for Patient A to recover:
 [I] did not [leave her alone]. I saw — I had other patients in the office, so intermittently she was with the nurse practitioner, who was the only other clinician who works in the office and with medical assistants until she felt up to leaving the examination room, although sometime during that time when I did go back into the room she asked if I could finish the examination and perform the ultrasound that I had told her that she would need for evaluation of her pain so that she would not have to come back. (Tr. at 75.)
At Patient A's request, Dr. Sherman performed the ultrasound. (Tr. at 75.) Later, Patient A moved to the waiting room while she waited for her friend to pick her up, and Dr. Sherman was called to the hospital so he did not see her leave. (Tr. at 77.) While at the hospital, Dr. Sherman received a phone call from Pamela Cross, informing him that Patient A had been taken to the hospital. (Tr. at 79.) Dr. Sherman went to the emergency room and saw Patient A and her family members along with a nurse and Dr. Riedel, the emergency room doctor, caring for her. (Tr. at 79.) Dr. Sherman spoke with Dr. Riedel *Page 17 
at that time and then later in the evening. (Tr. at 80.) That evening Dr. Riedel told Dr. Sherman that "their evaluation was that she had had vasovagal syncope and that they were going to be discharging her home." (Tr. at 80.) Dr. Sherman denied telling Dr. Riedel or any other practitioner that he had given Patient A any medication including Valium. (Tr. at 78, 80.) Dr. Sherman had no explanation for why Patient A tested positive for benzodiazepine. (Tr. at 82.) He denied having ever withdrawn Valium from the hospital to take back to his office, or keeping samples of Valium in his office. (Tr. at 82.)
 II Board's Decisions and Administrative Appeal
On May 18, 2006, the Board issued an Administrative Decision ("Decision I") and an Order, signed by the Hearing Officer for the Hearing Committee and assented to by the Director of Health, David R. Gifford, M.D. The Hearing Committee members' names are printed beneath the Hearing Officer's name, but they did not sign the decision. Decision I contains a footnote stating the following:
 During the course of the hearing, there were a number of continuances granted largely at the request of the [Dr. Sherman's] counsel, thereby prolonging the hearing. As a result of that fact, the composition of the hearing committee also changed. Two members were replaced during the hearing. The new committee members have read the transcript of earlier hearing dates and have examined all of the evidence in reaching this decision. (Decision I n. 1 at 1.)
Decision I summarized the testimony given during the hearings and made credibility determinations. Referring to the alleged seizure that Patient A experienced at her friend's mother's house, Decision I stated that "[u]pon review of the evidence, it is not clear at all *Page 18 
that the patient actually suffered a seizure." (Decision I at 8.) Ultimately, the Board found the testimony of Patient A and Dr. Riedel regarding what occurred on September 21, 1994 more credible than Dr. Sherman's testimony. Decision I found that "[t]he more credible evidence is that which was deduced from the patient, i.e. that when she lost consciousness, she was in the room alone with [Dr. Sherman]. She was unconscious for about one-half hour. When she awakened, she was still alone in the room with [Dr. Sherman]." (Decision I at 8.) Also, the Board found credible Patient A's "declaration that she took no drugs, as well as Dr. Riedel's testimony that valium or benzodiazepine was found in the patient's blood [sic], and that [Dr. Sherman] told [Dr. Riedel] that [Dr. Sherman] had administered it to the patient." (Decision I at 8-9.) The Board concluded that "it is more likely than not that [Dr. Sherman] did inject the patient with valium, which is a sedative and which brought about the patient's state of unconsciousness." (Decision I at 8.) Accordingly, the Board held that "the medical care that Dr. Sherman provided to the patient did not comport with the accepted standards of medical practice and that [Dr. Sherman] is guilty of Counts One through Five of the Specification of Charges." (Decision I at 9.) Decision I concluded:
 The Board hereby finds that [Dr. Sherman] engaged in unprofessional conduct in his care and treatment of Patient A. Though the Board can merely speculate as to his reasons for doing so, it is apparent from the credible testimony on the record that [Dr. Sherman] did inject the patient with benzodiazepine (or valium); that the patient was unconscious or asleep for approximately one-half hour during which time [Dr. Sherman] either remained in the examination room alone with her or left her unattended; that his testimony relative to what treatments were rendered to the patient and the sequence of events on the date in question is [sic] inconsistent; and that [Dr. Sherman] failed to document anything in the patient's record. [Dr. Sherman's] course of action with respect to patient A did *Page 19 
not conform to the standards of medical practice and constitutes unprofessional conduct deserving of discipline pursuant to § 5-37-5.1 of the General Laws. (Decision I at 17.)
The Board issued a reprimand relative to Dr. Sherman's license to practice medicine and conditioned his license on his adherence to any recommendations made by the Physicians Health Committee. Dr. Sherman was ordered to provide evidence to the Board of his compliance with the Physicians Health Committee's recommendations. (Decision I at 17-18.)
Dr. Sherman appealed Decision I by filing a complaint on June 16, 2006, within thirty days of the mailing of notice of Decision I, [17] as required by G.L. 1956 § 42-35-15(b), and within thirty days of the decision, as required by § 5-37-7(a).[18]
Dr. Sherman filed an amended complaint on June 19, 2006. Pursuant to § 42-35-15, Dr. Sherman claimed that his substantial rights have been prejudiced because the Board had acted in violation of constitutional or statutory provisions, in excess of statutory authority of the Rhode Island Department of Health, upon unlawful procedure, and upon other error of law. He further asserted that the Board had clearly acted erroneously, arbitrarily or capriciously, or abused its discretion. Dr. Sherman claimed that the Board improperly delegated power to the Physicians Health Committee in violation of his procedural due process rights pursuant to article 1, section 2 of the Rhode Island Constitution.[19]
Dr. Sherman alleged that the Board improperly delegated a judicial function to a third party *Page 20 
in violation of article 10, section 1 of the Rhode Island Constitution.[20] Dr. Sherman requested that this Court reverse or vacate the Board's order. The Board filed its answer on June 26, 2006.
On August 24, 2006, Dr. Sherman filed a letter with the Court, dated August 16, 2006 — authored by the Chairman of the Physicians Health Committee, Herbert Rakatansky, M.D., and Rosemary Maher — to Robert S. Crausman, M.D., of the Board, indicating that Dr. Sherman's psychological issues underlying the complaints against him had been addressed and concluding that no further evaluation was necessary. On October 26, 2006, Dr. Sherman's Motion for Leave To Present Additional Evidence was granted, remanding the case to the Rhode Island Department of Health for the taking of evidence related to the performance of an ultrasound on Patient A on September 21, 1994.
On December 8, 2006, the Board issued another Administrative Decision ("Decision II"). The Hearing Committee held a hearing on November 17, 2006 pursuant to the Superior Court's remand of October 26, 2006 for the taking of evidence related to the performance of an ultrasound on Patient A. (Decision II at 1.) Decision II noted that the Hearing Committee consisted of the same individuals who sat at Dr. Sherman's original hearing that resulted in Decision I. (Decision II n. 1 at 1.) Decision II stated that on remand, Dr. Sherman produced "what purports to be ultrasound films for Patient A . . . that were taken at her appointment on September 21, 1994. (Decision II at 2.) Decision II questioned Dr. Sherman's testimony at the remand hearing that Patient A assisted him with the ultrasound by inserting the probe, when he had previously testified that Patient A's vasovagal episode began before the ultrasound. (Decision II at 2-3.) Decision II *Page 21 
concluded that whether an ultrasound was conducted was not dispositive of the case. (Decision II at 3.) Further, it held that Dr. Sherman's testimony "has not cleared up the inconsistencies in his testimony at the first hearing," but, rather, "exacerbated the inconsistencies in view of the credible testimony furnished by the patient." (Decision II at 4.) Decision II declined to reverse Decision I. Decision II was signed by the Hearing Officer for Dr. Sherman's original hearing.
 III Standard of Review
This Court sits as an appellate court with a limited scope of review when reviewing the decisions of the Board of Medical Licensure and Discipline. See Mine Safety AppliancesCo. v. Berry, 620 A.2d 1255, 1259 (R.I. 1993). This Court's standard of review for a decision of the Department of Health is set forth in G.L. 1956 § 42-35-15(g):
 (g) The court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court may affirm the decision of the agency or remand the case for further proceedings, or it may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
 (1) In violation of constitutional or statutory provisions;
 (2) In excess of the statutory authority of the agency;
 (3) Made upon unlawful procedure;
 (4) Affected by other error or [sic] law;
 (5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
 (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.
This Court's review authority granted by § 42-35-15 is "circumscribed and limited to `an *Page 22 
examination of the certified record to determine if there is any legally competent evidence therein to support the agency's decision.'" Nickerson v. Reitsma,853 A.2d 1202, 1205 (R.I. 2004) (quoting Barrington Sch. Comm. v.Rhode Island State Labor Relations Bd.,608 A.2d 1126, 1138 (R.I. 1992)); see Environmental ScientificCorp. v. Durfee, 621 A.2d 200, 208 (R.I. 1993) (establishing that the agency's rationale should be supported by competent legal evidence). This Court may not substitute its judgment for that of the agency as to weight of the evidence on questions of fact.Interstate Navigation Co. v. Division of Public Utilities,824 A.2d 1282, 1286 (R.I. 2003) (citation omitted). Thus, it may not substitute its judgment for that of the agency in regard to credibility of witnesses. Baker v. Dep't of Employment andTraining Bd. of Review, 637 A.2d 360, 363 (R.I. 1994) (citingCosta v. Registrar of Motor Vehicles,543 A.2d 1307, 1309 (R.I. 1988)). This is true even when the Court "`might be inclined to view the evidence differently and draw inferences different from those of the agency.'" JohnstonAmbulatory Surgical Associates, Ltd. v. Nolan,755 A.2d 799, 805 (R.I. 2000) (quoting Rhode IslandPub. Telecomm. Auth. v. Rhode Island State Labor Relations Bd.,650 A.2d 479, 485 (R.I. 1994)).
This Court must affirm the agency's decision if any legally competent evidence exists in the record. Rhode IslandPub. Telecomm. Auth., 650 A.2d at 485. "Legally competent evidence is indicated by the presence of `some' or `any' evidence supporting the agency's findings." Environmental Scientific, 621 A.2d at 208 (citing Sartor v. Coastal Resources Mgmt.Council, 542 A.2d 1077, 1082-83 (R.I. 1988)); see Arnold v.Rhode Island Dept. of Labor and Training Bd. of Review,822 A.2d 164, 167 (R.I. 2003) (defining legally competent evidence as "relevant evidence that a reasonable mind might *Page 23 
accept as adequate to support a conclusion, and means an amount more than a scintilla but less than a preponderance[]") (quotingRhode Island Temps, Inc. v. Dep't of Labor and Training, Bd. ofReview, 749 A.2d 1121, 1125 (R.I. 2000)).[21]
"[I]t is also a well-recognized doctrine of administrative law that deference will be accorded to an administrative agency when it interprets a statute whose administration and enforcement have been entrusted to the agency." Pawtucket Power Associates LimitedPartnership v. City of Pawtucket,622 A.2d 452, 456 (R.I. 1993) (citations omitted). Our Supreme Court has established that when "`the provisions of a statute are unclear or subject to more than one reasonable interpretation, the construction given by the agency charged with its enforcement is entitled to weight and deference as long as that construction is not clearly erroneous or unauthorized.'" Labor Ready Northeast,Inc. v. McConaghy, 849 A.2d 340, 345 (R.I. 2004) (quoting Inre Lallo, 768 A.2d 921, 926 (R.I. 2001)). Also, this Court must defer to an agency's reliance on its expertise. "It is apodictic that a reviewing court should accord an agency's decision considerable deference when that decision involves a technical question within the field of the agency's expertise." R.I. HigherEduc. Assistance Auth. v. Sec'y U.S. Dep't of Educ.,929 F.2d 844, 857 (1st Cir. 1991) (citations omitted).
Regarding remedies, this Court may not substitute its judgment for the agency's with respect to "credibility of the witnesses or the weight of the evidence concerning questions of fact. However, an administrative decision can be vacated if it is clearly erroneous in view of the reliable, probative, and *Page 24 
substantial evidence contained in the whole record." Costa v.Registrar of Motor Vehicles, 543 A.2d 1307, 1309 (R.I. 1988) (citing Newport Shipyard, Inc. v. Rhode Island Comm'n for HumanRights, 484 A.2d 893 (R.I. 1984)). Also, the arbitrary and capricious standard of review "means that reviewing courts will uphold administrative decisions . . . as long as the administrative interpreters have acted within their authority to make such decisions and their decisions were rational, logical, and supported by substantial evidence." Goncalves v. NMU PensionTrust, 818 A.2d 678, 682-83 (R.I. 2003) (citing Doyle v. PaulRevere Life Ins. Co., 144 F.3d 181, 184 (1st Cir. 1998)). This Court will reverse factual conclusions of administrative agencies when they are "`totally devoid of competent evidentiary support in the record.'" Bunch v. Bd. of Review, Rhode Island Dept. ofEmployment and Training, 690 A.2d 335, 337 (R.I. 1997) (quotingMilardo v. Coastal Resources Management Council of RhodeIsland, 434 A.2d 266, 272 (R.I. 1981)); see Nguyen v.Chater, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam) (establishing that the court will invalidate findings of fact which are "derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts[]") (citations omitted). Additionally, "Questions of law . . . are not binding upon the court and may be reviewed to determine what the law is and its applicability to the facts." State v. Faria947 A.2d 863, 867 (R.I. 2008) (citations omitted). *Page 25 
 IV Statutory and Regulatory Scheme
It is well-settled that "[t]he legislative power to vest a board or department with reasonable discretion to license a given occupation so that its will as expressed in the statute may be executed, even though the exercise of that discretion be quasi judicial in character, is sustained by the great weight of authority." State v. Conragan,58 R.I. 313, 322, 192 A. 752, 756 (1937). The Board exists within the Department of Health. Section 5-37-1.1(a)(1). Section 5-37-1.3(2) grants the Board the authority "[t]o investigate all complaints and charges of unprofessional conduct against any licensed physician or limited registrant and hold hearings to determine whether those charges are substantiated or unsubstantiated." The Board may "appoint one or more members of the board to act for the members of the board in investigating the conduct or competence of any licensed physician or limited registrant." Section 5-37-1.3(4).
Section 5-37-5.2(a) allows any person, firm, corporation, or public officer to submit a complaint to the board alleging unprofessional conduct of a licensee. Unprofessional conduct is defined in § 5-37-5.1 as including, but not limited to, the thirty items listed in that section, as well as any further definition offered by the Board's regulations, as approved by the Director. If the complaint has merit, or the Board decides to act without a complaint, the Director must designate three members of the Board to serve on an investigating committee. Section 5-37-5.2(b). If the investigating committee "determines that action is required or the accused requests a hearing on allegations of unprofessional conduct, a specification of charges of unprofessional conduct against the licensee or limited registration holder shall be prepared by the *Page 26 
investigating committee and a copy shall be served upon the accused, together with notice of the hearing. . . ." Section 5-37-5.3. Section 5-3.7-5.2(e)(3) provides the framework for the hearing process:
 In the event of a determination by the investigating committee of probable cause for a finding of unprofessional conduct, the accused may request a hearing (see §§ 5-37-5.3 and 5-37-5.4). A hearing committee shall be designated by the chairperson consisting of three (3) other members of the board, at least one of whom shall be a physician member and at least one of whom is a public member. If the complaint relates to a procedure involving osteopathic manipulative treatment (OMT), at least one member of the investigating committee shall be an osteopathic physician member of the board. The hearing shall be conducted by a hearing officer appointed by the director of the department of health. The hearing officer shall be responsible for conducting the hearing and writing a proposed findings of fact and conclusions of law along with a recommendation of a sanction, if warranted. The hearing committee shall read the transcript and review the evidence and, after deliberation, the hearing committee shall issue a final decision including conclusions of fact and of law. The board shall make public all decisions including all conclusions against a license holder as listed in § 5-37-6.3.
Upon the hearing's completion, "the hearing committee of the board shall make a written report of its findings of fact, conclusions of law, and disciplinary order, if any." Section 5-37-6.1. Further,
 If a majority of the members of the board, sitting as the hearing committee, vote in favor of finding the accused guilty of unprofessional conduct as specified in the charges, the board shall prepare written findings of fact and law in support of that conclusion. The board shall immediately transmit its findings, together with an order stating the sanction to be imposed upon the accused, to the director who shall, as soon as practicable, order that appropriate action to be taken in accordance with the order of the board. In no case shall a person be found guilty of unprofessional conduct unless a majority of the hearing committee votes in favor of finding the person guilty. If the *Page 27 
accused is found not guilty, the board shall immediately issue an order dismissing the charges. Section 5-37-6.2.
In terms of discipline, the Board may "direct the director [of the Department of Health] to revoke or suspend licenses or registrations, or implement other disciplinary action against persons licensed or registered under [Ch. 5-37]." Section 5-37-1.3(5); seealso § 5-37-1.4(6) (granting the director the power to "deny, revoke, or suspend licenses and registrations or discipline licensees in accordance with the provisions of [Ch. 5-37]"); § 5-37-1.1(a)(1)(v) (establishing that the Director of the Department of Health is the chairperson of the Board). Additionally, the Board may "require a licensee to undergo a physical or psychiatric examination by a physician acceptable to the board, from a list provided to the licensee by the board, if probable cause exists to believe that allegations of misconduct against a licensee are caused by an impairment which has directly affected the ability of the licensee to conduct his or her practice professionally." Section 5-37-1.3(10)(i). The Board may also "advise the licensee of availability of the physicians health committee of the Rhode Island medical society, and in appropriate instances, to refer licensees to that committee for evaluation by appropriate medical professionals." Section 5-37-1.3(11). If the licensee is found guilty of unprofessional conduct, the director, at the Board's direction, may, among other things, administer a reprimand and require the licensee to "submit to the care, counseling, or treatment of a physician or program acceptable to the board." Sections 5-37-6.3(1), 5-37-6.3(5). A licensee aggrieved by the decision of the Board and Director has the right to appeal the decision, within thirty days after the decision of the Director, to the Superior Court pursuant to Rhode Island's Administrative Procedures Act, Ch. 42-35. Section 5-37-7. *Page 28 
In addition to Rhode Island statutory law, the Board must adhere to its own regulations. The Board has the power "[t]o adopt, amend, and rescind rules and regulations, with the approval of the director, necessary to carry out the provisions of [Ch. 5-37]," and "[t]o adopt and publish, with the approval of the director, rules of procedure and other regulations in accordance with the Administrative Procedure Act, chapter 35 of title 42." Sections 5-37-1.3(1), 5-37-1.3(9). The Department of Health has promulgated, pursuant to Ch. 5-37, the Rules and Regulations for the Licensure and Discipline of Physicians ("Rules"). 14 140 CRIR 031 (2008). Section 10.1 provides:
 The Director is authorized to deny or revoke any license to practice allopathic or osteopathic medicine or otherwise discipline a licensee upon finding by the Board that the person is guilty of unprofessional conduct which shall include, but not be limited to those items, or combination thereof, listed in section 5-37-5.1 of the General Laws. 14 140 CRIR 031-6.
With respect to agency procedure, § 14.1 of Rules states:
 All hearings and reviews required under the provisions of [Ch. 5-37] and rules and regulations herein, shall be held in accordance with the provisions of the rules and regulations of the Rhode Island Department of Health, entitled Rules and Regulations of the Department of Health Regarding Practices and Procedures Before the Department of Health and Access to Public Records of the Department of Health (R42-35-PP). 14 140 CRIR 031-8 (Rules and Regulations of the Department of Health Regarding Practice and Procedures Before the Department of Health and Access to Public Records of the Department of Health, 14 000 CRIR 001 (2004), hereinafter "Practices and Procedures").
Section 12.5 of Practices and Procedures provides that the administrative hearing officer shall "[s]ubmit a decision and/or order after due consideration of the hearing record, and only the hearing record, and matters noted on the record." 14 000 CRIR 001-16. Further, § 12.22 states, "The weight to be attached to any evidence in the record will rest within *Page 29 
the sound discretion of the [administrative hearing officer]. The matter is closed after the final decision and order is issued." 14 000 CRIR 001-21. Regarding final decisions, § 13.1 of Practices and Procedures provides, "All decisions and orders rendered by the [administrative hearing officer] shall be in writing, or stated on the record, and shall comply with the requirements of section 42-35-12 of [Rhode Island's Administrative Procedure Act] and shall be made public unless otherwise restricted by law."Id[22] Lastly, § 15.1 of Practices and Procedures states that a party aggrieved by a final written order of the administrative hearing officer may file a complaint with the Superior Court pursuant to § 42-35-15. If the final written order is not timely appealed, then it becomes final, and no further administrative appeal may be taken.
 V Law and Analysis A Credibility Determinations
Dr. Sherman — citing Verte v. Mearthane Products Corp.,583 A.2d 524 (R.I. 1990) and Environmental Scientific, 621 A.2d at 200 — argues that the Board's failure to observe the witnesses' testimony[23] extinguishes any duty of this Court to be deferential to *Page 30 
the Board's credibility determinations. Accordingly, Dr. Sherman argues that this Court is entitled to review credibility determinations de novo to ensure that Dr. Sherman is afforded due process.
In Verte, our Supreme Court examined the Workers' Compensation Commission Appellate Commission's ("Appellate Commission's") reversal of a trial commissioner's decision. Unlike this Court's review of an agency decision, our Supreme Court in Verte noted the "well-settled rule in this jurisdiction that when considering an appeal from a trial commissioner's decree, the Appellate Commission examines and weighs the evidence, draws its own conclusions, makes its own findings of fact, and ultimately decides whether the evidence preponderates in favor of or against the findings in the trial commissioner's decree." Verte, 583 A.2d at 527 (citations omitted). However, with respect to overruling credibility determinations made by such a trial commissioner who is presented with conflicting live medical testimony, our Supreme Court explained that the strict standard of review controls. That standard of review is that "since the trial commissioner [is] in the best position to assess the credibility of the medical witnesses by personally observing their demeanor, he should not be overruled unless clearly wrong, in a situation in which his decision was based on such a credibility finding."Id. (citing Davol, Inc. v. Aguiar,463 A.2d 170, 174 (R.I. 1983)). Thus in Verte, only because the trial commissioner's findings were not based on first-hand observations, did the second-tier, agency decision-maker notneed to show some deference to the first-tier's credibility findings by finding them "clearly wrong" before disturbing them. *Page 31 
Dr. Sherman's reliance on Environmental Scientific is similarly misplaced. Dr. Sherman notes that the EnvironmentalScientific Court stated that "[w]hen firsthand observations are not in issue, [the Workers' Compensation Appellate Division] may review the findings of the trial judge de novo."Environmental Scientific, 621 A.2d at 207. Here, it must be noted that our Supreme Court employed the permissive word "may" with respect to de novo review when credibility issues are not involved and was discussing standards that applied to the Workers' Compensation Court.[24] Importantly, in EnvironmentalScientific, our Supreme Court continued with respect to its analogy to the Workers' Compensation Court's review of credibility determinations: "when credibility evaluations are implicated, we have imposed a standard of review upon the appellate division that requires it to defer to the evidentiary findings of the trial judge. Before disturbing findings based on credibility determinations the appellate division must first find that the trial judge was clearly wrong." Environmental Scientific, 621 A.2d at 206. Accordingly, Dr. Sherman's reliance onVerte and Environmental Scientific for the proposition that this Superior Court may review the Board's credibility determinations de novo is misplaced.
The General Assembly has created two tiers of agency review for the Board: a hearing officer and a hearing committee. The DEM Director decides "a case upon recommendations by a hearing officer [and] need not actually hear the witnesses testify or hear oral arguments, but . . . must consider and appraise the evidence before rendering a decision." Environmental Scientific, 621 A.2d at 207 and G.L. 1956 § 42-17.7-6. Like the DEM Director, a Board of Medical Licensure and Discipline hearing committee, after *Page 32 
the hearing officer writes proposed findings of fact and conclusions of law and possibly recommends a sanction, "shall read the transcript and review the evidence and, after deliberation . . . shall issue a final decision including conclusions of fact and of law." Section 5-37-5.2(e)(3). The Board's hearing officer conducts "`adjudicatory proceedings[]' . . . and is clearly charged with a quasi-judicial role." See Johnston Ambulatory SurgicalAssociates, Ltd.,755 A.2d at 805 (R.I. 2000) (citations omitted). That hearing officer necessarily makes credibility determinations when he or she rejects certain conflicting testimony in favor of other testimony.Environmental Scientific, 621 A.2d at 207 (citingAguiar, 463 A.2d at 174). As with a hearing officer who conducts an adjudicatory hearing and makes credibility determinations, "[o]bservations of live testimony necessarily enter into a determination of what the trial judge believes and disbelieves." Id. at 206 (citing Laganiere v. BonteSpinning Co., 103 R.I. 191, 196, 236 A.2d 256, 258 (1967)). This touchstone of credibility is not available to an agency appellate division that does not observe the witnesses testify and simply reviews a silent record. Id. (citing Langaniere,103 R.I. at 196, 236 A.2d at 259).
However, at the same time, this Court must observe that "the further away from the mouth of the funnel that an administrative official is when he or she evaluates the adjudicative process, the more deference should be owed to the factfinder." Environmental Scientific, 621 A.2d at 208. "If the [hearing officer's] recommendations were not based on credibility determinations, the ultimate decision-maker may review the recommendations on a de novo basis." JohnstonAmbulatory, 755 A.2d at 807 (citing EnvironmentalScientific, 621 A.2d at 206-07); see also Verte, 583 A.2d 524 (finding that trial commissioner, who reviewed medical evidence in written form, was in no better *Page 33 
position than the second-tier decision-maker, the Appellate Commission, to assess the written evidence). On the other hand, when a hearing officer has relied on credibility determinations, the second-tier decision-maker should give great deference to the findings and conclusions of the hearing officer, unless they are clearly wrong. Environmental Scientific, 621 A.2d at 208.
Thus, this Court does not review the Board's credibility determinations de novo because the Board read hearing transcripts to form its decision.[25] With respect to the Board of Medical Review, § 5-3.7-5.2(e)(3) does not mandate that members of the hearing committee attend any of the hearings before the hearing officer. Section 5-3.7-5.2(e)(3) provides, in pertinent part:
 The hearing officer shall be responsible for conducting the hearing and writing a proposed findings of fact and conclusions of law along with a recommendation of a sanction, if warranted. The hearing committee shall read the transcript and review the evidence and, after deliberation, the hearing committee shall issue a final decision including conclusions of fact and of law.
Our Supreme Court further explained such an administrative process:
 [I]n a quasi-judicial context . . . we have held that `when a quorum of the commission reache[d] its decision after having access to a transcript of the hearing and also the evidence . . . [t]here is a presumption, soundly established, rationally reached, that administrative officials will properly consider the evidence before they reach a decision.' This principle is in accord with the general rule that `in the absence of specific statutory direction to the contrary the deciding member or members of an administrative or quasi-judicial agency need not hear the witnesses testify. . . . The general rule is that it is enough if those who decide have considered and appraised the *Page 34 
evidence.' Gardner v. Cumberland Town Council, 826 A.2d 972, 979 (R.I. 2003) (citations omitted).
Thus, noted our Supreme Court, "an administrative officer deciding a case upon recommendations by a hearing officer need not actually hear the witnesses testify or hear oral argument, but the decision maker must consider and appraise evidence before rendering a decision." Environmental Scientific, 621 A.2d at 207. Our Supreme Court further "acknowledge[d] that the decision maker may reject the hearing officer's recommendations on questions involving the credibility of contradictory witnesses." Id.
Overall, "[t]he Agency director need not accept the hearing officer's findings if there is other, competent evidence in the record to support the agency's conclusion." Id.
However, at the same time, in an agency like that of the Board of Medical Licensure and Review, which utilizes a two-tier structure, "the further away from the mouth of the funnel that an administrative official is when he or she evaluates the adjudicative process, the more deference should be owed to the factfinder." Id. at 208. Thus, differing levels of deference, not de novo review, are required by an agency decisionmaker and thereafter by the Superior Court upon review of that hearing officer's credibility determinations.
Our Supreme Court's pronouncements regarding the deference a second-tier decision-maker owes to the first-tier with respect to credibility determinations do not require de novo review by the second tier decision-maker or thereafter by this Superior Court in an agency proceeding. Thus, such pronouncements do not supersede this Court's well-established obligation not to weigh the evidence before an agency or make credibility determinations of its own.See, e.g., Baker, 637 A.2d at 363 (citingCosta, *Page 35 
543 A.2d at 1309). Nor does the out-of-jurisdiction case law cited by Dr. Sherman persuade this Court that it should, or could, alter its usual administrative appellate review.[26]
 B Form of the Board's Decisions
Dr. Sherman contends that Decisions I and II are not presented in the proper form pursuant to § 42-35-12. Section 42-35-12 provides in pertinent part:
 Any final order adverse to a party in a contested case shall be in writing or stated in the record. Any final order shall include findings of fact and conclusions of law, separately stated. Findings of fact, if set forth in statutory language, shall be accompanied by a concise and explicit statement of the underlying facts supporting the findings.
Dr. Sherman argues that Decision I's narrative form is problematic for appeal. Additionally, he claims that the Board neglected to include a standard of proof.
Our Supreme Court has noted that the "absence of required findings makes judicial review impossible, clearly frustrating § 42-35-15, the statute for review . . . and fails to satisfy the statutory requirements of § 42-35-12."East Greenwich Yacht Club v. Coastal Resources ManagementCouncil, 118 R.I. 559, 568, 376 A.2d 682, 687 (1977) (affirming a remand back to an agency because the agency failed to include any basic findings in its decision). Further, "`[T]he rationality of an agency's decision must encompass its fact findings, its interpretation of the pertinent law, and its application of the law to the facts as found." Sakonnet Rogers, Inc. v. CoastalResources Management Council, 536 A.2d 893, 896 (quotingArrow Transportation Co. v. United States, *Page 36 300 F. Supp. 813, 817 (D.R.I. 1969)). This Court "may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are: . . . (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion." Section 42-35-15(g)(6). Our Supreme Court has explained that "to make a finding of arbitrariness, capriciousness or an abuse of discretion, `the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" Sakonnet Rogers, 536 A.2d at 896 (quoting Citizens to Preserve Overton Park,Inc. v. Volpe, 401 U.S. 402, 416 (1971)). Further, the arbitrary and capricious standard "means that reviewing courts will uphold administrative decisions . . . as long as the administrative interpreters have acted within their authority to make such decisions and their decisions were rational, logical, and supported by substantial evidence." Goncalves v. NMU PensionTrust, 818 A.2d 678, 682-83 (R.I. 2003) (citing Doyle v. PaulRevere Life Ins. Co., 144 F.3d 181, 184 (1st Cir. 1998)).
As to Counts One through Four, this Court finds that the Board made sufficient findings of fact, pursuant to § 42-35-12, to support its conclusion that Dr. Sherman was guilty of unprofessional conduct. The Board recited and weighed the relevant testimony before it. It made several credibility determinations and ultimately made sufficient findings of fact to support its determination of Dr. Sherman's guilt. The crucial findings of the Board include its statements that "the Board can conclude from the testimony that it is more likely than not that [Dr. Sherman] did inject the patient with valium, which is a *Page 37 
sedative and which brought about the patient's state of unconsciousness."[27] (Decision I at 8.) The Board later found:
 [I]t is apparent from the credible testimony on the record that [Dr. Sherman] did inject the patient with benzodiazepine (or valium); that the patient was unconscious or asleep for approximately one-half hour during which time [Dr. Sherman] either remained in the examination room alone with her or left her unattended; that his testimony relative to what treatments were rendered to the patient and the sequence of events on the date in question is inconsistent; and that [Dr. Sherman] failed to document anything in the patient's record. (Decision I at 17.)
This Court finds that these findings are sufficient to make judicial review possible regarding Counts One through Four and reflect a consideration of relevant factors relating to unprofessional conduct. See East Greenwich Yacht Club,118 R.I. at 568, 376 A.2d at 687; Sakonnet Rogers, 536 A.2d at 896.
Dr. Sherman further argues that Decision I fails to state the standard of proof. Section 42-35-10 requires that for administrative cases, the "rules of evidence as applied in civil cases in the superior courts of this state shall be followed. . . ." In civil actions in Rhode Island, the preponderance of the evidence standard is used. See Notarantonio v.Notarantonio, 941 A.2d 138, 149 n. 5 (R.I. 2008) (citingParker v. Parker,103 R.I. 435, 442, 238 A.2d 57, 60-61 (1968)). Proof by a preponderance of the evidence is defined as "proof which leads the [factfinder] to find that the existence of the contested fact is more probable than its nonexistence." 2 McCormick onEvidence, § 339 at 484 (6th ed. 2006). *Page 38 
This Court finds that Decision I's "more likely than not" determination reflects a preponderance of the evidence standard.
Count Five of the Specification of Charges alleges, interalia, that Patient A sued Dr. Sherman for malpractice and that suit resulted in a settlement payment by Dr. Sherman to Patient A. Count Five asserts that such a payment constitutes unprofessional conduct in violation of §§ 5-37-5.1, 5-37-5.1(22), and 5-37-5.1(28) "by reason of a settlement arising from a medical liability claim. . . ." (State's Ex. 3 at 4.)
The Board's only reference to Count V in Decision I or Decision II is its statement that "the medical care that [Dr. Sherman] provided to the patient did not comport with the accepted standards of medical practice and that [Dr. Sherman] is guilty of Counts One through Five of the Specification of Charges." (Decision I at 9.) Decision I makes no finding of fact that Dr. Sherman and Patient executed a settlement agreement or that Dr. Sherman made any payments to Patient A. This Court finds that the Board's finding as to Count V is arbitrary and capricious, substantially prejudicing the rights of Dr. Sherman, because it neglected to make any finding of fact supporting Dr. Sherman's guilt. See East Greenwich YachtClub, 118 R.I. at 569, 376 A.2d at 687; Sakonnet Rogers, 536 A.2d at 896-97. Accordingly, this Court reverses the Board on Count V.
Our Supreme Court has established that "`[e]ven if the evidence in the record, combined with [this Court's] understanding of the law, is enough to support the order, [this Court] may not uphold the order unless it is sustainable on the agency's findings and for the reasons stated by the agency." Sakonnet Rogers, 536 at 897 (quoting 3 Davis,Administrative Law Treatise, § 14.29 at 128 (2d ed. 1980)). In any case, this Court notes *Page 39 
that the administrative record is devoid of any evidence demonstrating a settlement between Dr. Sherman and Patient A.
 C Substantial Evidence
Dr. Sherman argues that Decision I and II must be reversed because there is no basis in fact or law to support the Board's conclusions anywhere within the record. Dr. Sherman also asserts that the weight of the evidence clearly favors him.
This Court is not entitled to weigh evidence when reviewing an administrative decision. Section 42-35-15(g); see InterstateNavigation Co, 824 A.2d at 1286 (quoting Rocha v. StatePublic Utilities Comm'n, 694 A.2d at 725). This Court must examine the certified record to determine if there is any legally competent evidence to support the Board's decision. SeeNickerson, 853 A.2d at 1205.
Count One of the Specification of Charges against Dr. Sherman alleges that Dr. Sherman administered "benzodiazepines e.g. Diazapam, Valium into Patient A, without warning and without the knowledge or consent of Patient A, and further that [Dr. Sherman] gave false information to the Board of Medical Licensure and Discipline denying that he did so." (State's Ex. 3 at 3.)[28]
Count Two alleges, inter alia, that Dr. Sherman's administration of Benzodiazepine caused Patient A to lose consciousness for approximately thirty minutes in a partially nude state on Dr. Sherman's examination table alone in the room with Dr. Sherman. (State's Ex. at 3.)[29] *Page 40 
Count Three alleges, inter alia:
 [Dr. Sherman] did not disclose to Patient A that Benzodiazepines e.g. Diazapam, Valium had been administered and did not assist Patient A in explaining the presence of Benzodiazepines eg. Diazapam, Valium in her system and its relationship to her fainting on the examination table and initially did not divulge anything to Patient A that would explain why Patient A had to be taken to the Hospital and did not initially assist the Hospital medical physicians as to the reason why Patient A had fainted and lost consciousness. (State's Ex. 3 at 3.)[30]
Count Four of the Specification of Charges against Dr. Sherman alleges that Dr. Sherman "did not record in his medical records procedures which he performed on Patient A which were required to be noted and which resulted in the medical records amounting to a false record of treatment under the circumstances." (State's Ex. 3 at 3-4.)[31]
To support his argument that the Board's decisions as to Counts One through Four have no basis in fact or law to justify its conclusions, Dr. Sherman highlights the testimony of Dr. Burt, an anesthesiologist with over twenty-five years experience with the use of Valium. Dr. Burt testified that an intramucosal or intramuscular injection into the vagina would take a relatively long period of time to absorb in the blood and would be a very painful injection. (Tr. at 30-31, 12/29/04.) It would also take a long time to inject. (Tr. at 30-31, 12/29/04.) Further, he testified that it would take twenty to thirty milligrams, a relatively large quantity of Valium, to achieve absorption and drowsiness within twenty to thirty minutes. (Tr. at 31, 12/29/04.) He testified that an injection of Valium into the vagina would be more painful than a pinch. (Tr. at 33, 12/29/04.) *Page 41 
Furthermore, Dr. Sehl and Dr. Riedel did not contradict Dr. Burt's testimony. In fact, neither doctor concluded that Valium or any other benzodiazepine accounted for Patient A's condition. Dr. Riedel made three provisional diagnoses: ruptured ovarian cyst, vasovagal episode, and situation adjustment. (Tr. at 14, 10/12/04.) He testified that none of these diagnoses related to an interaction with Valium. (Tr. at 26, 10/12/04.) Dr. Sehl gave Patient A a discharge diagnosis of vasovagal syncope. (Tr. at 13, 10/22/04; State's Ex. 13.) Dr. Sehl did not think that Valium caused Patient A to lose consciousness. (Tr. at 13-14, 10/22/04.)
Dr. Burt's uncontradicted testimony regarding the effects of a Valium injection into the vagina is not consistent with Patient A's description of her fainting in the examination room on September 21, 1994. Patient A did not testify to a significant amount of pain or length of time for the pain, calling the feeling a "pinch." (Tr. at 47, 8/25/04.) She recalled seeing a swab in Dr. Sherman's hands and never saw him holding a syringe. (Tr. at 83, 8/25/04.) It took only sixty to ninety seconds after experiencing the pinch for Patient A to become extremely tired and groggy. (Tr. at 47-48, 8/25/04.) Soon thereafter Patient A lost consciousness, for what she estimated was approximately a half an hour. (Tr. at 48, 8/25/04; Tr. at 17, 9/22/04.) Patient A did not testify that Dr. Sherman injected her with Valium, thereby causing her to lose consciousness. In fact, the only evidence in the record reflecting the possibility of Valium inducing fainting was elicited by Dr. Litchman, a member of the Hearing Committee. During Dr. Litchman's examination of Dr. Sehl, Dr. Sehl testified that medication could cause a patient to lose consciousness. (Tr. at 17, 10/22/04.) The Board noted in Decision I, "[Dr. Sehl] did state that the syncope episode could be caused by the introduction of drugs to the patient's *Page 42 
body." (Decision I at 6.) Dr. Sehl also testified that when Valium is administered intravenously, it can cause sleepiness or semi-unconsciousness. (Tr. at 18-19, 10/22/04.) However, no evidence exists in the record that Dr. Sherman administered Valium intravenously to Patient A prior to her fainting.
Legally competent evidence amounts to "some" or "any" evidence supporting the Board's findings. Environmental Scientific, 621 A.2d at 208 (citing Sartor v. Coastal Resources Mgmt.Council, 542 A.2d at 1082-83). Further, legally competent evidence is "`relevant evidence that a reasonable mind might accept as adequate to support a conclusion, and means an amount more than a scintilla but less than a preponderance.'" Arnold, 822 A.2d at 167 (quoting Rhode Island Temps, 749 A.2d at 1125). The Board's decisions fail to point to any evidence, nor does the record contain any evidence, to support its finding that Dr. Sherman's administration of Valium caused Patient A to lose consciousness. Dr. Burt provided uncontroverted testimony that it would take a long time to inject Valium, that such an injection would be more painful than a pinch, and that it would take a relatively long time for the blood to absorb. Such testimony, which the Board did not reject, makes the Board's conclusion that an injection of Valium caused Patient A to lose consciousness illogical. See Goncalves, 818 A.2d at 682-83 (citingDoyle, 144 F.3d at 184). Without substantial evidence to support the finding that Patient A lost consciousness due to an injection of Valium, the Board's finding of guilt as to Counts Two and Three, both dependent on such a cause, is both clearly erroneous and arbitrary and capricious. See Costa, 543 A.2d at 1309;Goncalves, 818 A.2d at 682-83. *Page 43 
Because Dr. Sherman's substantial rights have been prejudiced by this result, this Court reverses the Board's finding of guilt as to Counts Two and Three.[32]
In addition to highlighting Dr. Burt's testimony to show the medical improbability of a Valium injection inducing Patient A's loss of consciousness, Dr. Sherman argues that his timeline of events is more believable than Patient A's. Further, Dr. Sherman questions the credibility of Patient A and Dr. Riedel. Specifically, Dr. Sherman notes that in an attorney's letter and answer to an earlier interrogatory, Patient A had stated that it was Dr. Sherman who requested that she remove her clothes from the waist down. (Respondent's Ex. B; Respondent's Ex. C.) However, before the Board, she testified that a receptionist had asked her to remove her clothes from the waist down. (Tr. at 74, 8/25/04.) Dr. Sherman asserts that Patient A had changed her testimony regarding the pain she felt during the examination as originally a pinch and then a pin prick. (Tr. at 47, 8/25/04; Tr. at 83, 8/25/04.) Regarding Dr. Riedel's credibility, Dr. Sherman notes that Dr. Riedel testified to the importance of maintaining accurate medical records but failed to record that Dr. Sherman had administered a benzodiazepine to Patient A. (Tr. at 16-19, 10/12/04.) Dr. Sherman also points out that Dr. Riedel was unable to recall any details about the patients he treated before or after Patient A on September 21, 1994. (Tr. at 21-23, 10/12/04.)
In this case, the Hearing Committee considered testimony from doctors familiar with the circumstances as well as from Patient A. Additionally, Dr. Sherman presented the testimony of Dr. Burt. As required by § 5-3.7-5.2(e)(3), the Hearing Officer *Page 44 
personally conducted all of the hearings. The Hearing Officer explained in detail the evidence that the Board used in adopting its decision. The Board found credible Patient A's assertion that she did not knowingly take any drugs, other than Advil. (Tr. at 56, 8/25/04.) The Board also found credible Dr. Riedel's testimony that Patient A's toxicology screen returned positive for benzodiazepines. (Tr. at 6, 10/12/04.) The positive test is part of the administrative record. (State's Ex. 13.) Lastly, the Board found credible Dr. Riedel's testimony that Dr. Sherman told Dr. Riedel that he had administered benzodiazepines to Patient A. (Tr. at 7, 10/12/04.) This Court notes that Dr. Sherman's medical record for Patient A does not reflect an administration of benzodiazepines, and in a September 19, 2002 letter to Nikki S. Deary, Chief of the Health Professions Regulation of the Board of Medical Licensure and Discipline, Dr. Sherman denied administering medication of any kind to Patient A. (State's Ex. 11; State's Ex. 12.)
This Court finds that the record contains legally competent evidence to support the Board's findings of guilt as to Counts One, alleging, inter alia, the administration of benzodiazepines to Patient A and Dr. Sherman's provision of false information to the Board of Medical Licensure and Discipline, and Four, alleging,inter alia, Dr. Sherman's failure to record in his medical records procedures which he performed on Patient A. The administrative record contains "more than a scintilla of evidence" that Dr. Sherman, at some point on September 21, 1994, administered benzodiazepines to Patient A, without informing Patient A, and then denied such activity to the Board. See Arnold, 822 A.2d at 167 Additionally, Dr. Sherman did not record an administration of benzodiazepines in Patient A's medical record. Because the Board's findings as to Counts One and Four are *Page 45 
supported by legally competent evidence, its determination of guilt as to those counts is neither clearly erroneous nor arbitrary or capricious. See Costa, 543 A.2d at 1309; Goncalves, 818 A.2d at 682-83.
 D Incorrect Findings of Fact
Additionally, Dr. Sherman argues that the Board's findings are based on incorrect findings of fact. Specifically, he notes when finding him not credible, the Board stated that Dr. Sherman explained Patient A's symptoms as a vasovagal episode, then alternatively as a ruptured cyst. The Board also noted that neither diagnosis was noted in Patient A's chart. (Decision I at 8.) Dr. Sherman maintains that he never testified that he ruptured a cyst during Patient A's examination. As noted supra, Dr. Sherman noticed fluid in the cul-de-sac, causing him to question whether Patient A had a ruptured cyst or whether the fluid was from the exam, but he did not question whether he had ruptured a cyst. (Tr. at 89, 96; State's Ex. 11.) Additionally, the chart Dr. Sherman prepared for Patient A does note that Patient A had a vasovagal reaction to the examination of her right ovary. (State's Ex. 11.)
Dr. Sherman also points out that the Board found that he first testified that Patient A never lost consciousness but then testified that when Patient A lost consciousness, he left her in the examination room with a medical assistant. (Decision I at 8.) On July 1, 2004, Dr. Sherman testified that he did not recall Patient A losing consciousness. (Tr. at 94, 7/1/04.) He testified that Patient A experienced a "prolonged post-ictal state," meaning "post event confusion." (Tr. at 80-81, 93, 7/1/04.) Then, on December 29, 2004, Dr. Sherman testified that Patient A became less responsive in that when he would *Page 46 
speak to her, she would not respond after he examined her right ovary. (Tr. at 66-67, 69, 12/29/04.) Dr. Sherman asserts that he consistently testified that Patient A never completely lost consciousness.
Dr. Sherman argues that these findings are not supported by evidence in the record and appear to be motivated by caprice rather than logic. This Court has stated that the arbitrary and capricious standard "means that reviewing courts will uphold administrative decisions . . . as long as the administrative interpreters have acted within their authority to make such decisions and their decisions were rational, logical, and supported by substantial evidence." Goncalves v. NMU PensionTrust, 818 A.2d 678, 682-83 (R.I. 2003) (citing Doyle v. PaulRevere Life Ins. Co., 144 F.3d 181, 184 (1st Cir. 1998)). Also, "[A]n administrative decision can be vacated if it is clearly erroneous in view of the reliable, probative, and substantial evidence contained in the whole record." Costa v. Registrar ofMotor Vehicles, 543 A.2d 1307, 1309 (R.I. 1988) (citingNewport Shipyard, Inc. v. Rhode Island Comm'n for HumanRights, 484 A.2d 893 (R.I. 1984)). Our Supreme Court has stated that incompetent evidence becomes prejudicial "only when it reasonably appears that the incompetent evidence so influenced the judgment of the trial justice as to have caused him to rest his decision in whole or substantial part on that evidence."Corrado v. Providence Redevelopment Agency,110 R.I. 549, 557, 294 A.2d 387, 391 (R.I. 1972) (citations omitted). This Court finds that the Board's decision as to Count One and Four is not arbitrary or capricious or clearly erroneous because the record presents reliable, probative, and substantial evidence to support the Board's conclusion even without the alleged incorrect factual findings. Accordingly, these particular findings do not substantially prejudice the rights of Dr. Sherman. *Page 47 
 VI Conclusion
After reviewing the record, this Court affirms the Board's determination of guilt as to Counts One and Four because substantial evidence exists in the record to support the Board's conclusion. The Board's determination as to Counts One and Four was not in violation of constitutional or statutory provisions, was not in excess of its statutory authority, was not made upon unlawful procedure, and was not clearly erroneous. It was not arbitrary or capricious, nor was it characterized by an abuse of discretion. This Court finds that the Board's decision as to Count Five was arbitrary and capricious, thereby prejudicing the substantial rights of Dr. Sherman, because the Board failed to make any findings of fact supporting Dr. Sherman's guilt. This Court further finds that the Board's decision as to Counts Two and Three was clearly erroneous and arbitrary and capricious, also prejudicing the substantial rights of Dr. Sherman, because substantial evidence does not exist in the record to support the conclusion that Valium caused Patient A to lose consciousness. Accordingly, this Court reverses Decision I's determination of guilt as to Counts Two, Three, and Five. This Court reverses Decision II inasmuch as it affirms the Board's determination of guilt as to Counts Two, Three, and Five. This Court vacates the Order, and its accompanying sanction, [33] imposed on Dr. Sherman in Decision I and affirmed in Decision II. (Decision I at 17-18; Decision II at 4.) *Page 48 
Regarding discipline of Dr. Sherman, Section 5-37-1.3(5) grants the Board the authority "[t]o direct the director to revoke or suspend licenses or registrations, or implement other disciplinary action against persons licensed or registered. . . ." It is a fundamental principle that when the legislature "has entrusted an administrative agency with the responsibility of selecting the means of achieving the statutory policy `the relation of remedy to policy is peculiarly a matter for administrative competence.'"American Power Light Co. v. Securities and Exchange Comm'n329 U.S. 90, 112 (1946) (quoting Phelps Dodge Corp. v. NationalLabor Relations Bd., 313 U.S. 177, 194 (1941)). Further, "Discretion is particularly broad when an agency is concerned with fashioning remedies and setting enforcement policy." GreaterBoston Television Corporation v. Federal CommunicationsCommission, 444 F.2d 841, 857 (D.C. Cir. 1971); see
5 Jacob A. Stein et al., AdministrativeLaw, § 41A.01 at 41A-7-8 (2007) ("It is the agency, in applying its expertise, that determines which sanctions best carry out the policies of the statute. . . .") (footnote omitted); 3 Charles H. Koch, Jr. Administrative Law andPractice, § 11.15 at 84 (2d ed. 1997) ("[T]he court should give special weight to relationship [of a remedy] to policymaking in which agencies have special competence"). Recognizing that the Board is in the best position to make a determination as to what constitutes an appropriate discipline, this Court remands this matter to the Board for a consideration of an appropriate sanction of Dr. Sherman, if any, consistent with this Decision.
Counsel shall submit an appropriate judgment for entry.
[1] The Board found no unprofessional conduct for Counts Six through Sixteen, and its determination as to those counts is not before this Court.
[2] The Board's Specification of Charges alleged that Count One's allegation amounted to a violation of § 5-37-5.1, 5-37-5.1(18), 5-37-5.1(19), 5-37-5.1(23), 5-37-5.1(24), and 5-37-5.1(26), which provide:
 The term "unprofessional conduct" as used in this chapter includes, but is not limited to, the following items or any combination of these items and may be further defined by regulations established by the board with the prior approval of the director:
 . . . .
 (18) Professional or mental incompetency;
 (19) Incompetent, negligent, or willful misconduct in the practice of medicine which includes the rendering of medically unnecessary services, and any departure from, or the failure to conform to, the minimal standards of acceptable and prevailing medical practice in his or her area of expertise as is determined by the board. The board does not need to establish actual injury to the patient in order to adjudge a physician or limited registrant guilty of the unacceptable medical practice in this subdivision;
 . . . .
 (23) Failing to furnish the board, its chief administrative officer, investigator or representatives, information legally requested by the board;
 (24) Violating any provision or provisions of this chapter or the rules and regulations of the board or any rules or regulations promulgated by the director or of an action, stipulation, or agreement of the board;
 . . .
 (26) Violating any state or federal law or regulation relating to controlled substances[]
[3] The Board's Specification of Charges alleged that Count Two's allegation amounted to a violation of § 5-37-5.1, 5-37-5.1(7), § 5-37-5.1(18), § 5-37-5.1(19). Section 5-37-5.1(7) includes within the definition of unprofessional conduct, "[i]mmoral conduct of a physician . . . in the practice of medicine."
[4] The Board's Specification of Charges alleged that Count Three's allegation amounted to a violation of § 5-37-5.1, § 5-37-5.1(7), § 5-37-5.1(14), § 5-37-5.1(18), § 5-37-5.1(19). Section 5-37-5.1(14) includes within the definition of unprofessional conduct, "[m]aking willful misrepresentations in treatments."
[5] The Board's Specification of Charges alleged that Count Four's allegation amounted to a violation of § 5-37-5.1, § 5-37-5.1(8), § 5-37-5.1(9), § 5-37-5.1(18), § 5-37-5.1(19), and Rules and Regulations for the Licensure and Discipline of Physicians (R5-37-MD/DO) § 11.4. Sections 5-37-5.1(8) and 5-37-5.1(9) include within the definition of unprofessional conduct:
 (8) Willfully making and filing false reports or records in the practice of medicine;
 (9) Willfully omitting to file or record, or willfully impeding or obstructing a filing or recording, or inducing another person to omit to file or record, medical or other reports as required by law[]
Section 11.4 of the Rules and Regulations for Licensure and Discipline of Physicians provides in pertinent part:
 The records must contain sufficient information to justify the course of treatment, including, but not limited to: active problem and mediation lists; patient histories; examination results; test results; records of drugs prescribed, dispensed, or administered; and reports of consultations and hospitalizations. 14 140 CRIR 031-6-7 (2007).
[6] The Board's Specification of Charges alleged that Count Five's allegation amounted to a violation of § 5-37-5.1, § 5-37-5.1(22), § 5-37-5.1(28). Sections 5-37-5.1(22) and 5-37-5.1(28) include within the definition of unprofessional conduct:
 (22) Multiple adverse judgments, settlements or awards arising from medical liability claims related to acts or conduct which would constitute grounds for action as described in this chapter;
 . . .
 (28) A pattern of medical malpractice, or willful or gross malpractice on a particular occasion[]
[7] Dr. Sherman described a vasovagal reaction as the following: "[T]he central nervous system responds to stimulation and occasionally people get a reaction, sometimes nausea, sometimes dizziness, sometimes light seizure activity. It can occur under various, different situations." (Tr. at 80.)
The Attorneys' Dictionary of Medicine and Word Finder
explains that a vasovagal attack, also known as vasovagal syncope, is defined as:
 [a] loss of consciousness resulting from an instability of the autonomic nervous system, which controls the caliber of blood vessels and the blood pressure, especially of the vagus nerve (which carries fibers of the parasympathetic nervous system). It is marked by a decrease of the blood pressure, a pallor (paleness), sweating, and a slowing of the heart beat. All these phenomena are the result of an excessive activity of the parasympathetic nervous system. The common fainting spell is an example of vasovagal syncope. 6 J.E. Schmidt, Attorneys' Dictionary of Medicine and Word Finder V-42-43 (2000).
[8] Dr. Sherman testified that a "[p]ost-ictal state can be anything from confusion, to dizziness, lethargy, happens to people after they have a seizure, for instance, happens after a vasovagal reaction, happens after things that are stimulated again by the central nervous system." (Tr. at 93.)
[9] Patient A testified that she "kind of was like, `Ouch, that hurt.'" (Tr. at 47, 8/25/04.)
[10] Dr. Riedel explained his reference to situational adjustment:
 That was in reference to the whole of the day's events. The patient was in an outside office and then subsequently was in the emergency department and was quite upset not only at her physical condition but at the general confusional state that she found herself in and the psychiatry consult [sic] more or less came to the conclusion that there were no underlying psychiatric problems or issues other than being sick and being very upset and concerned about that. (Tr. at 12.)
[11] Intramucosal is defined as:
 Within the substance of a mucous membrane. A mucous membrane is the moist lining membrane of body cavities which communicate with the outside, as the mouth, nose, intestine, etc. The mucous membrane is to those surfaces what skin is to the external surfaces. 3 J.E. Schmidt, Attorneys' Dictionary of Medicine and Word Finder I-172 (2000).
[12] Intramuscular is defined as:
 In the muscle; within the substance of the muscle; as, intramuscular injection, an injection which deposits the material in the muscle tissue. 3 J.E. Schmidt, Attorneys' Dictionary of Medicine and Word Finder
I-173 (2000).
[13] Intravenous is defined as:
 Within a vein; into a vein; as, intravenous injection, an injection of material into the bloodstream through the wall of a vein, by means of a hollow needle. 3 J.E. Schmidt, Attorneys' Dictionary of Medicine and Word Finder I-180 (2000).
[14] Dr. Sherman described the speculum as "metallic but it does come in other materials, but it's a device that actually opens to bring the walls of the vagina open to be able to visualize the structures inside." (Tr. at 61.)
[15] In describing the bi-manual examination, Dr. Sherman stated that "because there are organs that are not visible, gynecologists typically will use two hands which is called bi-manual, one inside the vagina and one on the abdomen to feel the uterus, the ovaries and any other organs that may be palpable." (Tr. at 65.)
[16] Dr. Sherman again offered a definition for a vasovagal reaction:
 This is what's commonly referred to as the flight or fight reaction that people have and that the central nervous system has two components, a sympathetic and para-sympathetic nervous system and our bodies react to stimulations in certain ways. A vasovagal reaction is the flight part of that when our bodies are withdrawing in terms of some stimulus, be it emotional stimulus or physical, painful stimulus or even fear of having a painful stimulation. What happens is that the circulation changes such that it's very common to get less perfusion, less blood flow to certain vital areas which can cause some imbalance, can cause seizure type activity and is almost invariably short lived. (Tr. at 69-70.)
[17] Decision I was mailed on May 22, 2006.
[18] Dr. Sherman also properly notified David R. Gifford, M.D., M.P.H., in his Capacity as Director of the Rhode Island Department of Health, within thirty days of the decision and filed such notice with the Court on June 16, 2006, as required by § 5-37-7(a).
[19] Article 1, section 2 of the Rhode Island Constitution provides in part, "No person shall be deprived of life, liberty or property without due process of law. . . ."
[20] Article 10, section 1 of the Rhode Island Constitution provides, "The judicial power of this state shall be vested in one supreme court, and in such inferior courts as the general assembly may, from time to time, ordain and establish."
[21] Substantial evidence has been defined synonymously with legally competent evidence as "`such relevant evidence that a reasonable mind might accept as adequate to support a conclusion, and means an amount more than a scintilla but less than a preponderance.'" Newport Shipyard, Inc. v. Rhode Island Com'n forHuman Rights, 484 A.2d 893, 897 (R.I. 1984) (quotingCaswell v. George Sherman Sand Gravel Co., R.I.,424 A.2d 646, 647 (1981)). Thus, these terms are used interchangeably.
[22] Section 42-35-12 provides in pertinent part:
 Any final order adverse to a party in a contested case shall be in writing or stated in the record. Any final order shall include findings of fact and conclusions of law, separately stated. . . . Included with the final order shall be a separate notice advising the parties of the availability of judicial review, the appeal period and the procedure for filing an appeal, and providing a reference to the statutory authority.
[23] Of the ten transcripts contained in the record, only the following — September 22, 2004 (Henry Litchman, M.D.); October 22, 2004 (Henry Litchman, M.D.); January 4, 2006 (Henry Litchman, M.D. and Shelagh McGowan); January 11, 2006 (Henry Litchman, M.D., Shelagh McGowan, Noubar Kessimian, M.D.); and February 8, 2006 (Henry Litchman, M.D., Shelagh McGowan, Noubar Kessimian, M.D.) — indicate attendance by hearing committee members. Though Dr. Litchman's attendance is not indicated on theOctober 12, 2004 transcript cover sheet, his participation in that hearing evidences his attendance. (Tr. at 30-34, 10/12/04.)
[24] The Workers' Compensation Court was formerly the Workers' Compensation Commission. Environmental Scientific, 621 A.2d at 206 (citing G.L. 1956 (1986 Reenactment) §§ 28-29-26, 28-30-2, and28-35-28, as amended by P.L. 1990, ch. 332).
[25] This Court is also mindful that Dr. Litchman observed the testimony of Patient A first-hand on September 22, 2004; Dr. Riedel on October 12, 2004; Dr. Sehl on October 22, 2004; and Dr. Sherman on January 4, 2006. Shelagh McGowan also observed Dr. Sherman's testimony on January 4, 2006. These members of the hearing committee had the opportunity to discuss their observations during deliberations.
[26] Dr. Sherman's reliance on the following cases — In theMatter of Saab, 406 Mass. 315, 328, 547 N.E.2d 919, 927 (1989);Salem v. Massachusetts Comm'n Against Discrimination,404 Mass. 170, 174, 534 N.E.2d 283, 285 (1989); Dowd v. Dir. ofDiv. of Employment Security,390 Mass. 767, 771, 459 N.E.2d 471, 473 (1984; Petition ofSmith, 652 A.2d 154, 157 (N.H. 1994) — is misplaced. This Court notes that none of these cases grants a reviewing court the authority to review credibility determinations de novo.
[27] The Board accuses Dr. Sherman and his counsel of overlooking that the Specification of Charges accused Dr. Sherman of administering a benzodiazepine, not Valium specifically. However, this Court notes that the Board's crucial finding did mention Valium specifically. Thus, Dr. Sherman's attorney correctly focused on Valium.
[28] The Specification of Charges asserts that these actions constitute a violation of §§ 5-37-5.1, 5-37-5.1 (18), 5-37-5.1(19), 5-37-5.1(23), 5-37-5.1(24), and 5-37-5.1(26).
[29] The Specification of Charges further states that this action violated §§ 5-37-5.1, 5-37-5.1(7), 5-37-5.1(18), 5-37-5.1(19).
[30] The Specification of Charges furthers states that these actions amount to unprofessional conduct under §§ 5-37-5.1, 5-37-5.1(7), 5-37-5.1(14),5-37-5.1(18), 5-37-5.1(19).
[31] Further, the Specification of Charges asserts that these actions constitute a violation of §§ 5-37-5.1, 5-37-5.1(8), 5-37-5.1(9), 5-37-5.1 (18), 5-37-5.1(19), and § 11.4 of its Rules.
[32] In order to find that the record lacks substantial evidence to support a finding that Valium caused Patient A to faint, this Court does not need to reject the Board's determination that "[t]he more credible evidence is that which was deduced from the patient, i.e. that when she lost consciousness, she was in the room alone with [Dr. Sherman]. She was unconscious for about one-half hour. When she awakened, she was still alone in the room with [Dr. Sherman]." (Decision I at 8.)
[33] This Court notes that in his Amended Complaint, Dr. Sherman asserted that the Board improperly delegated power to the Physicians Health Committee in violation of his procedural due process rights pursuant to article 1, section 2 of the Rhode Island Constitution. Dr. Sherman also asserted that the Board improperly delegated a judicial function to a third party in violation of article 10, section 1 of the Rhode Island Constitution. Because this Court vacates the sanctions imposed upon Dr. Sherman, these issues are moot. See City of Cranston v. Rhode IslandLaborers' Dist. Council Local 1033, 960 A.2d 529, 533 (R.I. 2008) (establishing that if a court's judgment "would fail to have a practical effect on the existing controversy, the question is moot . . . ").