**INTERSTATE NAVIGATION CO. d/b/a The Block Island Ferry et al.**

v.

**DIVISION OF PUBLIC UTILITIES AND CARRIERS OF THE STATE OF RHODE ISLAND et al.**

Nos. 2002–83–M.P., 2002–86–M.P.

Supreme Court of Rhode Island.

June 13, 2003.

Lauren E. Jones, Providence, Merlyn P. O'Keefe, Peace Dale, Michael R. McElroy, for Plaintiff.

Mark Jay Hagopian, Providence, Paul Roberti, Jon G. Haopian, John Spirito, Jr., for Defendant.

Present: WILLIAMS, C.J., FLANDERS, GOLDBERG, and FLAHERTY, JJ.

### OPINION

WILLIAMS, Chief Justice.

This case is the latest installment of the seemingly endless litigation involving Interstate Navigation Co. d/b/a The Block Island Ferry (Interstate) and Island Hi–Speed Ferry, LLC (Hi–Speed) concerning the two companies' entrance into the high-speed ferry market. *See In re Hi–Speed Ferry, LLC,* 746 A.2d 1240 (R.I.2000). In these petitions for certiorari, the Division of Public Utilities and Carriers of the State of Rhode Island (the Division) and Hi–Speed complain that a Superior Court trial justice erred by failing to affirm a Division report and order. Specifically, the report and order (1) fined Interstate $22,000 for its president's refusal to answer questions posed to her at a Division hearing, (2) required Interstate to apply for a Certificate of Public Convenience and Necessity (CPCN) if it wanted to enter the high-speed ferry market, and (3) prohibited Interstate from attempting to obtain that CPCN for three years. The pertinent facts are as follows.

### I

### Facts and Travel

Interstate and Hi–Speed are two competing corporations that offer ferry services to the Town of New Shoreham (the town or Block Island). Interstate provides standard ferry services between Galilee and Block Island's "Old Harbor." Hi–Speed provides high-speed catamaran ferry services between Galilee and "New Harbor," also on Block Island. On February 20, 1998, Hi–Speed filed an application with the Division for a CPCN to provide a high-speed ferry service from Galilee to Block Island. The proposed service is claimed to substantially enhance the quality of the ferry ride. The ninety-two-foot aluminum catamaran travels at full capacity at a speed of twenty-eight knots and carries up to 149 passengers. The end result of this new service is a trip in which the travel time is not only cut in half, but also is a significantly smoother ride.

Interstate and the town successfully intervened in Hi–Speed's CPCN hearing. During that hearing, Interstate's President Susan Linda (Mrs. Linda) was asked several times whether Interstate planned to provide high-speed ferry services in the future. She repeatedly refused to answer, citing the privileges of confidentiality and the Fifth Amendment. The Division ultimately approved Hi–Speed's application for a water carrier CPCN to operate the

proposed high-speed ferry. Pursuant to the contested case provision of the Administrative Procedures Act, codified at G.L. 1956 § 42–35–15, Interstate and the town appealed that decision to the Superior Court. A Superior Court trial justice affirmed the issuance of the CPCN, but remanded the case to the Division with instructions to modify it to be effective only for a reasonable period.

On April 2, 1999, while that appeal was pending, Hi–Speed requested that the Division summarily investigate the conduct of Interstate,[1] alleging that Interstate had acted deceptively when it denied its interest in entering the high-speed ferry market during Hi–Speed's initial CPCN hearing. The Division agreed to investigate Interstate. After that investigation, the Division determined that Mrs. Linda had no right to assert the Fifth Amendment, nor did the Division's inquiry into Interstate, as a public utility, cross into the realm of confidential information. Therefore, in its report and order the Division concluded that Mrs. Linda, as a representative of Interstate, had obstructed the regulatory process of the Division in violation of G.L 1956 § 39–2–8. Pursuant to its authority as promulgated by that statute, the Division required Interstate's shareholders to pay a civil penalty of $22,000; $1,000 for each unanswered question.

Furthermore, drawing negative inferences from Linda's refusal to answer the questions posed to her at the hearing, the Division determined that Interstate had engaged in the act of planning an entrance into the high-speed ferry market. As a result of this determination, the Division prohibited Interstate from engaging in high-speed ferry services for three years, and required that Interstate would have to apply for a CPCN if it desired to provide high-speed ferry services at the end of the three-year moratorium.

Interstate and the town appealed the Division's order to Superior Court pursuant to § 42–35–15. On appeal, the trial justice reversed the Division's order. Specifically, the trial justice concluded that the Division exceeded its statutory authority when it imposed the three-year moratorium on Interstate's potential high-speed ferry activities and required that Interstate would have to apply for a CPCN if it intended to provide high-speed services in the future. Furthermore, the trial justice found that the $22,000 fine also was beyond the scope of the Division's authority because the fines provided in § 39–2–8 are limited to $1,000 per offense. Thus, the trial justice reduced the $22,000 fine to $1,000. The Division and Hi–Speed timely filed separate petitions for writs of certiorari. This Court granted both petitions on April 19, 2002. Thereafter, Interstate agreed to a self-imposed stay of the trial justice's decision pending the final resolution of both petitions for certiorari. Additionally, Interstate agreed to wait until this Court decided the case before seeking a $21,000 refund from the state.

The Division now contends that the imposition of the $22,000 fine on Interstate was authorized by law. The Division and Hi–Speed together argue that the trial justice's interpretation of G.L.1956 § 39–3–4 is incorrect and provides unfair advantages to certain water carriers, and that G.L.1956 § 39–4–10 empowers the Division to curtail Interstate's participation in ·the high-speed ferry market. We address each issue *seriatim*.

---

1. General Laws 1956 § 39–4–13, entitled "Summary investigation by division," provides that when "an investigation of any matter relating to a public utility should, for any reason be made, [the Division] shall summarily investigate the same with or without notice as it shall deem proper."

## II

### Standard of Review

■ Pursuant to § 42–35–15, the Superior Court has appellate jurisdiction to review final orders of state administrative agencies. *Rocha v. State Public Utilities Commission*, 694 A.2d 722, 725 (R.I.1997). When reviewing the agency decision, the Superior Court trial justice "shall not substitute [his or her] judgment for that of the agency as to the weight of the evidence on questions of fact." *Id.* (quoting § 42–35–15(g)). Rather, the trial justice must uphold the agency's conclusions when they are supported by legally competent evidence on the record. *Id.* The trial justice may, however, reverse or modify the agency's decision if it is: "(1) [i]n violation of constitutional or statutory provisions; (2)[i]n excess of the statutory authority of the agency; (3)[m]ade upon unlawful procedure; (4)[a]ffected by other error or law; (5)[c]learly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or (6)[a]rbitrary or capricious or characterized by abuse of

discretion or clearly unwarranted exercise of discretion." Section 42–35–15(g).

■ When this Court reviews the trial justice's decision via certiorari, "we apply the 'some' or 'any' evidence test and review the record to determine if there is some or any legally competent evidence in the record to support his findings." *Rocha*, 694 A.2d at 726 (quoting *Sartor v. Coastal Resources Management Council*, 542 A.2d 1077, 1083 (R.I.1988)). Therefore, we do not weigh the evidence, but rather determine whether the trial justice was legally justified in modifying or reversing the agency's order. *Id.*

## III

### Civil Penalty

■ The trial justice reversed the Division's order that Interstate pay $22,000 in fines because of Mrs. Linda's refusal to answer twenty-two questions at Hi-Speed's public hearing. Although the trial justice correctly determined that Mrs. Linda did not have the right to assert either the confidentiality privilege [2] or the Fifth Amendment privilege against self-incrimination,[3] he concluded that the Division ex-

---

2. The Access to Public Records Act (APRA), G.L.1956 § 38–2–1 provides that the public shall have access to public records, subject to certain restrictions such as disclosure that would constitute an invasion of privacy. Also excepted from the APRA are "[t]rade secrets and commercial or financial information obtained from a person, firm or corporation which is of a * * * confidential nature." *Providence Journal Co. v. Convention Center Authority*, 774 A.2d 40, 46 (R.I.2001). We have "defined as confidential any financial or commercial information whose disclosure would be likely either '(1) to impair the Government's ability to obtain necessary information in the future; or (2) to cause substantial harm to the competitive position of the person from whom the information was obtained.' " *Id.* at 47. We find it difficult to see how answering the simple question of whether Interstate planned on offering high-speed service compromises its competitive position; especially when it was during a public hear-

ing in which Hi-Speed was divulging all kinds of information concerning its plan of operations. Therefore, we conclude that the trial justice correctly decided that Mrs. Linda could not assert that the information sought from her was confidential.

3. General Laws 1956 § 39–4–21 and G.L 1956 § 39–12–34 provide that no person shall be criminally prosecuted for any incriminating statements made before a division hearing unless that witness has committed perjury. In this case, there was no evidence that Mrs. Linda was committing perjury. No one from Interstate ever had stated that Interstate definitely planned on entering the high-speed ferry market. Therefore, Mrs. Linda could not contradict any earlier statements by answering the questions posed to her in the Division hearing. Consequently, Mrs. Linda had no right to the Fifth Amendment privilege against self-incrimination.

ceeded its statutory authority under § 39–2–8. That statute permits the Division to levy a fine of up to $1,000 for failure to perform a legal duty. Mrs. Linda had a legal duty to answer the questions posed to her at the hearing. Although we concur with the Division that Mrs. Linda's failure to candidly answer the questions posed to her constituted chicanery of the most deceptive sort, we agree with the trial justice that the Division overstepped its statutory authority in imposing a $1,000 fine for each question that Mrs. Linda did not answer.

The Division contends that each question that Mrs. Linda refused to answer is a separate offense, thereby authorizing it to fine Interstate the maximum for each question that Mrs. Linda refused to answer. All twenty-two questions, however, essentially were asking the same thing: Does Interstate plan to enter the high-speed ferry market in the future?[4] We refuse to read slight variations of the same basic question to permit the Division to fine Interstate $1,000 for each variation of that question that the Division can construct. Accordingly, the trial justice's decision reducing the Division's fine of Interstate to $1,000 is affirmed.

## IV

### Certificate of Public Convenience and Necessity

The Division and Hi–Speed also assign error to the trial justice's interpretation of § 39–3–4, permitting Interstate to enter the high-speed ferry market without demonstrating that its entrance would serve the public convenience and necessity. We agree with the Division and Hi–Speed.

We review *de novo* questions of statutory interpretation. *Stebbins v. Wells*, 818 A.2d 711, 715 (R.I.2003). "When construing a statute 'our ultimate goal is to give effect to the purpose of the act as intended by the Legislature.'" *Oliveira v. Lombardi*, 794 A.2d 453, 457 (R.I.2002)(quoting *Webster v. Perrotta*, 774 A.2d 68, 75 (R.I.2001)). This Court must interpret literally a clear and unambiguous statute and attribute the plain and ordinary meaning to its words. *Solas v. Emergency Hiring Council of Rhode Island*, 774 A.2d 820, 824 (R.I.2001). When a statute is unambiguous, "there is no room for statutory construction and we must apply the statute as written." *Id.* (quoting *State v. DiCicco*, 707 A.2d 251, 253 (R.I.1998)).

Section 39–3–3 states that "[n]o common carrier of persons and/or property operating upon water between termini within this state shall hereafter furnish or sell its services unless the common carrier shall first have made application to and obtained a certificate from the [D]ivision certifying that public convenience and necessity required the services." If, however, the common carrier incorporated before April 30, 1954, then it is entitled to a CPCN as a matter of right without participating in a public hearing. *See* § 39–3–4. That certificate sets out the scope and termini of the carrier's operations. *See id.*

Because Interstate was incorporated before April 30, 1954, it did not have to participate in a public hearing to receive its initial CPCN. Therefore, on June 25, 1954, Interstate received its CPCN without having to demonstrate that it would serve the public convenience and necessity.

---

4. For example, Mrs. Linda was asked:

   Q: "Does Interstate intend to offer public high speed ferry service from Galilee to Block Island in the year 1999?"

   Q: "Does Interstate intend to offer public high speed ferry service from the Port of Galilee to Block Island in the year 2000?"
   Q: "Does Interstate intend to offer public high speed ferry service from the Port of Galilee to Block Island in the year 2001?"

That grant without a public hearing was the extent of the benefit that § 39–3–4 provides to Interstate. However, the trial justice and Interstate read § 39–3–4 to provide it with even greater continuing benefits. They interpreted § 39–3–4 as giving Interstate carte blanche to provide any new kind of ferry service because the carrier was operating before April 30, 1954. We simply cannot countenance this interpretation. Rather, we must adhere to the plain meaning of § 39–3–4. Thus, § 39–3–4 permits only those carriers incorporated before April 30, 1954, to avoid the public hearing requirement before acquiring a CPCN. We do not, however, read that provision to permit the carrier to change the scope and type of service that is set out in its original certificate without demonstrating that such a change will benefit the public convenience and necessity.

A high-speed ferry substantially alters the kind of service that water carriers can provide. It requires different equipment, it provides faster service and it operates on the water in an entirely different way than a standard ferry does. Because Interstate's original CPCN did not and could not have contemplated the new, high-speed technology, Interstate's use of such a substantially different service naturally would be a material alteration of the scope specified in its original CPCN. Furthermore, Interstate's original CPCN was written to be "subject * * * to such terms, conditions, and limitations as are now by law, or may hereafter be, attached to the exercise of the privileges granted herein." Thus, to comply with both the terms of Interstate's initial CPCN as well as the requirements of § 39–3–3, Interstate must petition for a new certificate and cannot benefit from § 39–3–4 because the new and substantially different technology is outside the original scope of Interstate's services. Accordingly, we reverse the trial justice's decision permitting Interstate to avoid demonstrating that its entry into the high-speed market would serve the public necessity and convenience.

We do not suggest, however, that changes in every aspect of a carrier's service require a new CPCN. Rather, we limit our holding only to material changes, as in this case, that substantially alter the service provided for in the original certificate.

## V

### The Three–Year Moratorium

■ The three-year prohibition on Interstate's offering high-speed ferry service began on May 1, 2000. That prohibition ended on May 1, 2003. Therefore, the issue of the propriety of the moratorium, which was before this Court on May 8, 2003, now is moot. Nevertheless, the moratorium did not stand alone. As a regulatory measure it was linked to the requirement that Interstate would have to apply for a CPCN at the end of the moratorium if it wished to provide high-speed ferry service. Thus, although the moratorium has ended, the other part of the Division's mandate remains applicable to Interstate. Therefore, considering the moratorium and the requirement of CPCN approval as part of the same regulating order, the propriety of the order viewed as a whole is not moot. We therefore address the merits of this issue below.

Section 39–4–10 provides that the Division may, upon hearing and investigation, regulate any practice, act or service that "is unjust, unreasonable, insufficient, preferential, unjustly discriminatory, or otherwise in violation of any of the provisions of chapters 1—5 of [title 39]." In this case, after conducting an investigation and hearing, the Division determined that Interstate had engaged in planning for providing high-speed ferry services. It based this determination on evidence that Interstate's assistant operations manager Josh-

ua Linda (Mr. Linda) went on test rides on a high-speed ferry and inquired about the prices of such a vessel that was advertised for sale, as well as negative inferences garnered from Mrs. Linda's invocation of the Fifth Amendment when questioned about Interstate's interest in achieving high-speed ferry capabilities. Therefore, the Division entered its order that prohibited Interstate from entering the high-speed ferry market for three years pursuant to its authority under § 39–4–10.

The trial justice, however, concluded that the Division had no authority to prohibit Interstate from engaging in high-speed ferry services for three years. Specifically, the trial justice determined that the Division was not regulating Interstate based upon a current practice, act or service, as the statute unambiguously provided, but rather was issuing the moratorium because of the possibility that Interstate may enter the market in the future.

We certainly agree with the trial justice that § 39–4–10 is unambiguous. It permits the Division to issue orders regulating carriers if it finds that "any * * * practice, act or service * * * *is* unjust, unreasonable, insufficient, preferential, unjustly discriminatory, or otherwise in violation of * * * chapters 1—5 of [Title 39] * * *." (Emphasis added.) The word "is" is defined as "[t]he third person singular present indicative of the verb be. * * * In its present state; as it stands." The American Heritage Dictionary of the English Language 693 (10th ed.1981). Given this definition, the plain meaning of § 34–4–10 clearly demonstrates that there must be an actual, currently existing practice, act or service for the Division to regulate a carrier after an investigation and hearing.[5]

We depart from the reasoning of the trial justice, not in his interpretation of § 39–4–10, but rather in his application of that section to the facts in this case. The three-year prohibition was based upon evidence that Interstate had begun planning to enter the high-speed ferry market. The Division properly adduced that evidence from the proceedings before it. Because Mrs. Linda invoked the Fifth Amendment privilege against self-incrimination in a civil proceeding, the Division was permitted to draw the adverse inference against Interstate that it was planning to enter the high-speed market. *See Baxter v. Palmigiano*, 425 U.S. 308, 318, 96 S.Ct. 1551, 1558, 47 L.Ed.2d 810, 821 (1976). At the very least the Division was entitled to conclude that Interstate was engaged in acts and practices to determine whether it should do so. The Division also inferred from Mr. Linda's actions elicited during Hi–Speed's CPCN hearing, which included taking test rides on high-speed vessels and inquiring about the prices of such vessels, that Interstate had engaged in active planning to enter the high-speed ferry market. Therefore, it is clear that the Division based the three-year prohibition on Interstate's current activity of planning to enter the high-speed ferry market. All that remains to decide is whether § 39–4–10 includes planning within its definition of "practice, act or service." We conclude that it does.

This Court never has interpreted the definition of the "practice, act or service" language as written in § 39–4–10. Therefore, we must look to other bodies of law for guidance. Specifically, we turn to the principles of the criminal law of attempt for aid in determining when planning rises to the level of an act. For the purposes of

---

**5.** Taking a cue from former President William Jefferson Clinton, the interpretation of G.L. 1956 § 39–4–10 "depends upon what the meaning of the word is means." Stephen A. Saltzburg, *Perjury and False Testimony: Should the Difference Matter So Much?*, 68 Fordham L.Rev. 1537, 1580 (2000).

criminal attempt, a person's preparation or plan for a crime qualifies as an act only when that person has made a "substantial step" toward completing the ultimate goal. *See State v. Ferreira,* 463 A.2d 129, 132 (R.I.1983). We now conclude that this standard also is appropriate when determining whether engaging in planning is sufficient to amount to a "practice, act or service" under § 39–4–10. Thus, only if Interstate's preparation was a substantial step toward deciding whether it should pursue high-speed ferry capabilities will it come within the purview of the Division's regulatory authority under § 39–4–10. It is clear to us that Interstate had taken substantial steps toward acquiring high-speed capacity. Mr. Linda's efforts to test ride a high-speed vessel, combined with his multiple inquiries into the price and specifications of such vessels undoubtedly is a substantial step toward deciding whether to ultimately acquire or otherwise offer high-speed service. Those actions are sufficient to constitute an act under the "substantial step" standard. Therefore, the Division had the authority under § 39–4–

10 to impose the three-year moratorium on Interstate.

## Conclusion

For the foregoing reasons, the petitions for certiorari are denied in part and granted in part. The judgment of the Superior Court is affirmed in part and quashed in part. We affirm the trial justice's decision to reduce the Division's fine to $1,000. We quash the trial justice's decision to exempt Interstate from the Division's order requiring it to demonstrate that its entrance into the high-speed ferry market would benefit the public convenience and necessity. That portion of the Division's order is reinstated. Furthermore, although the three-year moratorium has expired, we reverse the trial justice's finding that the Division exceeded its authority by imposing that prohibition. The papers of the case are to be returned to the Superior Court with our decision endorsed thereon.