DECISION
Before this Court is an appeal from a decision of the Warwick Municipal Employees' Retirement Board (Board). Appellant Donald L. Cramer (Donald) seeks reversal of a March 19, 2008 Board decision that Appellant's wife, the deceased Mary E. Cramer (Mary), chose the ten-year guarantee form of annuity when she retired from employment with the City of Warwick (Appellee or City) in 1990. The Court identifies the Appellants by first name for the purposes of clarity only, no disrespect is intended. Jurisdiction is pursuant to G.L. 1956 § 45-24-69.
 I Facts Travel
Mary began her employment with the City of Warwick in 1972. After ten (10) years of employment with the City, Mary's retirement plan "vested"; this resulted in Mary's entitlement to certain benefits provided by Chapter 60 of the Warwick Code of Ordinances. *Page 2 
On April 4, 1990, after working as a librarian for the City of Warwick for nearly eighteen (18) years, Mary contacted the City's Personnel Office to review her pension options and make arrangements for her retirement. Mary met with Personnel official Patricia Audette (Audette). Mary and Audette went over Mary's pension options pursuant to the City of Warwick Retirement System Group Contract Number Y-9467 — Application for Retirement (the Contract). The form version of the Contract offers two options: (1) Normal Form — "Payments will continue as long as you live and stop when you die"; and (2) Optional Form — "Payments will continue as long as you live, and if your spouse is still living when you die, will be continued to him or her as long as he or she lives. The amount of pension under the Optional form is less than under the normal form." (Appellant's Ex. 1, 6.) The Contract was modified, however, to include a third option, an alternate version of the Optional Form. The alternate Optional Form is the "Ten-Year Guarantee." This option grants the retiree monthly payments until he or she dies, "but if he/she passes away before the ten years is up, it continues to his/her beneficiary up to the ten year point and then terminates." (Appellant's Ex. 6.) The Ten-Year Guarantee provides for a monthly payment lower than the Normal Form but higher than the Optional Form.
While discussing retirement with Mary, Audette filled out forms detailing Mary's wishes. (Appellant's Ex. 5.) The Personnel Office calculated Mary's estimated monthly pension amounts as of August 1, 1990 and detailed each pension option. (Appellant's Ex. 6.) The Normal Form was estimated to provide $341.46 per month and the Ten Year Guarantee $320.87 per month. The Optional Form — which would guarantee payments for a decedent retiree's spouse for the spouse's life — had three sub-options permitting the retiree and the surviving spouse to receive the same amounts, or for the retiree to receive a larger amount during his or her *Page 3 
life, and upon his or her death, the surviving spouse would receive a lower payment. (Appellant's Ex. 6.)
The Personnel Office form, dated April 4, 1990, shows the Ten-Year Guarantee amount, $320.87/mth, circled. A handwritten note at the bottom of the form reads as follows:
 Pat,
 I opted for the second — (ten-year guarantee). I'll probably outlive him because he smokes, but, just in case . . .
 Thanks again for all your help.
 Mary
 (Appellant's Ex. 6.)
More paperwork remained before Mary's October 1, 1990 retirement. On August 28, 1990, Mary signed a "City of Warwick Retirement System Application for Retirement." (Appellant's Ex. 3.) This form displayed two options and a space for a person to mark their choice: The Normal Form and the Optional Form. At the top of the page, however, and below the Optional Form, Ten Year Guarantee was typed. The form, signed by Mary, has an "X" marked at the space provided for electing the Optional Form, above the typed "Ten Yr. Guar." (Appellant's Ex. 3.) On September 19, 1990, Mary again signed an outdated "Application for Retirement" form that had to be modified to include the Ten Year Guarantee. Like the August 28 form, the September 19 form had "Ten Year Guarantee" typed at the top of the page, but this time more conspicuously: the words were in all capital letters and underlined. (City's Ex. B.) "Ten Yr. Guar" was also typed below the space for electing the Optional Form. (City's Ex. B.) This space was marked with a typewritten "X." (City's Ex. B.) Instead of the estimate calculated in April — which for the Normal Form was $341; Ten Year Guarantee was $320, and the Optional Form ranged from $284 to $310 — the September form listed the actual calculation of Mary's monthly benefit as $332.07. *Page 4 
Mary retired in October of 1990, and began receiving monthly payments of $332.07. Mary passed away in 2006, sixteen (16) years after her retirement. Donald, Mary's surviving spouse, was notified by the City of Warwick that Mary's retirement benefits would cease because the ten year period in which a retiree's death results in payments for the surviving spouse had elapsed. Donald protested the termination of benefits, arguing that Mary had selected the "Optional Form" — which would continue payments to the surviving spouse of a decedent retiree for the remainder of the spouse's life — not the Ten Year Guarantee. The City refused to change its position, so Donald appealed to the Warwick Retirement System Retirement Board.
At the March 19, 2008 Board Meeting, the Board heard Donald's appeal from the City's decision to terminate his wife's pension. (R. 2-3.) Donald's attorney began by describing his case: Donald's attorney described the forms signed by Mary and emphasized that she had marked an "X" next to "Optional Form" on three forms. (R. 2-3.) Donald's attorney also stated that he would call James Cramer, Mary and Donald's son, to testify to the conversations he had with Mary concerning her retirement plans and to the hardship that their family would suffer if the payments ceased. (R. 3.)
Upon questioning by Donald's attorney, James testified to holding the Power of Attorney for his father Donald, who lived in Florida and was unable to attend the hearing. (R. 3.) James testified that in discussing Mary's will with her, Mary stated that Donald "would receive her pension or a portion of her pension, not the full amount but enough that he would survive ok if she died first." (R. 4.) James stated that he never saw the paperwork at issue until after the City terminated Mary's benefits after her death. (R. 4).
Board member Oscar Shelton (Shelton) then asked Donald's attorney about the typewritten Ten Year Guarantee on all the forms. (R. 5.) Shelton, in addition to being a member *Page 5 
of the Board, is also the City's Personnel Director and represented the City in this case. Donald's attorney replied that the understanding of his clients was always that the "X" marked the Optional Plan despite the "Ten Yr. Guar." typed below that "X." Donald's attorney further stated that Donald and Mary's daughter, a City of Warwick employee, thought the Ten Year was operative, though she understood it to mean that Donald would receive payments for ten years after Mary's death, regardless of how long Mary lived and received payments. (R. 5.)
Shelton then called Jane Jordan (Jordan), Deputy Personnel Director, to testify. (R. 5.) Jordan testified that she had worked in the Personnel Department for 24 years. (R. 5.) Jordan further testified that she had around ten years' experience making pension estimates and calculations, and had been doing so exclusively for the past four or five years. (R. 5, 9-10.)
Jordan testified that Audette left the office in 2000, ten years after assisting Mary in her retirement planning. (R. 5.) Jordan further testified that Audette had trained her in the calculation of pension estimates and ultimate payments. (R. 6.) Jordan stated that she met the Cramers after they learned that Mary's payments would not be continuing to Donald since Mary had died over ten (10) years after retirement. (R. 6.) Although Jordan had not prepared Mary's forms with her, Shelton presented Jordan with the forms and asked her to explain what she saw. (R. 6.) Jordan explained that the forms indicated that Mary had chosen the Ten Year Guarantee, which provides for payments for the retiree for life, and if the retiree dies "before ten years is up, it continues to his or her beneficiary up to the ten year point." (R. 6-7.)
Jordan explained the different amounts of money listed on the different forms: The information from the April 4, 1990 form was used to calculate the estimates listed on the August 1, 1990 form. (R. 6-7.) Later documents, however, show that Mary was set to receive a slightly different number than that listed in the estimates, which Jordan explained was the result of the *Page 6 
service and salary calculation conducted on Mary's actual retirement date. (R. 7.) The calculation on Mary's retirement date put the Normal payments at $353, Ten Year Guarantee payments at $332.07, and the Optional payments ranging from $294 to $321. (R. 7.) Jordan then testified that Mary's first check — for $332.07 — went through inspection at the Personnel Office for accuracy before being mailed to Mary in November of 1990. (R. 8.)
Shelton stated that he noticed both Mary's and Donald's signatures on a document stating "I am not interested in the Optional form and elect to choose the normal form of retirement, whereby benefits would be discontinued upon my death." (R. 7.) Shelton then asked Jordan about the fact that all the forms appear to only account for two options: Normal and Optional. (R. 8.) Jordan explained that the City's ordinances provide for three plans, but the forms had not been updated; they still reflected only the two plans. (R. 8-9.) Jordan noted that this was why "Ten Year Guarantee" was typed in, twice, on every form. (R. 8-9.) Jordan testified that although Donald was a named beneficiary on the form, his name was not in the space in which the lifetime beneficiary of the Optional Form would be listed. (R. 9.) Jordan also testified that a "reduction factor" was used on Mary's materials. (R. 9.) Jordan explained that a reduction factor is used to reduce a pension based on the option chosen; and that both the Optional Form and Ten Year Guarantee require using a reduction factor. (R. 9.) The factor used for Mary was .9397. (R. 9.)
Donald's attorney then questioned Jordan. He asked her if the Ten Year Option meant that someone would get paid for ten years. (R. 9.) Jordan replied in the affirmative. (R. 9.) Donald's attorney asked whether, upon Mary's death, Donald would get paid for ten years. (R. 9.) Jordan replied that the Ten Year Guarantee guarantees 120 payments, so if Mary died within ten years, the guaranteed 120 payments would nonetheless be paid. (R. 10.) Donald's *Page 7 
attorney stated "[t]hat is awful confusing, I think you people better come up with a better system." (R. 10.)
Upon further questioning from Donald's attorney, Jordan testified that she had not spoken with Audette about Mary's pension. (R. 10.) Her testimony had only been regarding what she saw on the forms and what she knew the forms meant according to her 24 years in the personnel office — ten of which included experience in pension calculations. (R. 10.) Jordan testified that one of the estimate documents was an internal worksheet, and that the Personnel Office did not ordinarily give applicants copies of City Ordinances. (R. 10.) Jordan testified that the Personnel Office staff member who spoke with each applicant would give the applicant copies of all the relevant forms. (R. 11.) Jordan testified that according to past practice, she would state that Audette had given Mary the forms. (R. 11.) When pressed by Donald's attorney, Jordan testified that there was no statement in the forms themselves indicating that Audette had followed standard protocol and given the forms to Mary, and that she had not personally observed Audette handing the forms to Mary. (R. 11.)
Donald's attorney then questioned Jordan about individual forms. (R. 12.) He stated that he didn't see Mary's signature on the October pension estimates form, a statement to which Jordan agreed. (R. 12.) When Jordan stated that Audette would have given that form to Mary, Donald's attorney replied, "[w]e assume it was but we don't have any evidence of it." (R. 12.) While being questioned about how detailed the Optional Form description was on a form that described the Optional Form and Normal Form, Jordan interrupted to state "I just want to make note that it does say ten year guarantee in the corner." Donald's Attorney then abandoned questioning of Jordan to argue to the Board the confusing nature of the forms. (R. 13.) *Page 8 
Shelton then re-examined Jordan. (R. 14.) Shelton asked Jordan about Audette and the practices of the Personnel Office. Jordan testified that Audette was "thorough to the point of obsession" and stated that when discussing the Ten Year Guarantee with an applicant, Personnel Office staff would always use an example, such as, "if you retire and five years after you retire, you pass away, the remainder of five years would go to your listed beneficiary." (R. 14.)
Shelton asked Jordan about an issue brought to the Board's attention by Donald's attorney: the different numbers on the August and October forms. (R. 14.) Jordan explained that the August estimate was based on Mary's salary and available vacation, and that Mary must have used some of her vacation in August or September, resulting in a different estimate for October, her actual retirement date. (R. 14.) Shelton then asked Jordan about all the forms. Jordan testified that on at least four forms, "Ten Year Guarantee" was typed at the top. (R. 14-15.)
Donald's attorney then re-cross-examined Jordan. Donald's attorney emphasized Jordan's lack of personal observation of the Audette-Mary meeting. (R. 15.) Jordan explained her testimony that Audette had to have given the forms to Mary was based upon her knowledge of the Personnel Office practices, and her specific knowledge of Audette. (R. 15.) Donald's attorney asked Jordan again about what options were available on the forms, to which Jordan explained that the forms accommodate for two options; Normal and Optional; but that Ten Year Guarantee is typewritten on the top of the page and near the Optional Form space. (R. 16.) Jordan testified that the Ten Year Guarantee is not specifically described on this form, but is described both on a different form and in person. (R. 14-16.) Jordan admitted that the forms needed correction to account more clearly for the three, not two, available options. (R. 17.) Jordan stated that although she agreed that the forms needed correction, "to say [Mary] didn't know what she was signing regarding the ten year, I would not agree with you." (R. 17.) *Page 9 
Board member David Picozzi began questioning Jordan. (R. 17.) He asked about Donald's signature on the form stating "I am not interested in the Optional form and elect to choose the normal form of retirement, whereby benefits would be discontinued upon my death." (R. 17.) Jordan explained that this form is used to evince the spouse's consent to receiving no payments upon the retiree's death. (R. 17.) Donald's attorney stated that that form does not say that the retiree has chosen the Ten Year Guarantee, but Jordan pointed out that "Ten Year Guarantee" is typed at the top of the page. (R. 17.) Donald's attorney then noted that the Ten Year Guarantee was not explained on that form. (R. 17.)
Board member Jeanne Muto-Kyle stated that Mary had received the October 1990 estimate showing her payment being $332 under the Ten Year Guarantee, and Mary then began receiving $332 checks. (R. 18.) She asked Jordan whether Mary had inquired into why she didn't receive checks for $294, the amount listed as the Optional Form payment. (R. 18.) Jordan stated that since the Office of Personnel was under the impression that Mary had chosen the Ten Year plan, it saw no error when it inspected Mary's first check, because the check comported with the Ten Year Guarantee's estimated amount. (R. 18.) The Board members discussed the City's pension booklet. (R. 18.) Jordan testified that besides having personal discussions with Personnel Office staff at the commencement of retirement planning, City employees also receive a pension booklet explaining their options multiple times during their employment with the state. (R. 18.)
Donald's attorney argued again that the forms were "grossly defective," and that there was no evidence that Mary met with Personnel Office staff to discuss her options. (R. 19.) Jordan then stated "Why would we do all these estimates if she didn't come into Personnel." (R. 19.) Donald's attorney stated that "hard core testimony" would be required by a court on the *Page 10 
issue of Mary's purported Personnel Office meetings, and that the forms explaining the Normal and Option Forms but merely noting the Ten Year Guarantee "just do[]n't pass muster." (R. 19.) Donald's attorney argued that the handwritten note wherein Mary states she choose the Ten Year Guarantee, signed in August, does not control the later September documents. (R. 19.) Notably, the September forms Donald's attorney referred to stated "TEN YEARGUARANTEE" at the top, and the "X" was marked on the space next to "Optional Form" but above "(Ten Yr. Guar.)" (Appellant's Ex. 1 (emphasis in original).)
The Board discussion ensued. Ernest Zmyslinski discredited Donald's attorney's argument that there was no evidence of meetings between Mary and Audette. (R. 20.) Zmyslinski stated that although Jordan was not present at the meetings, her testimony as to the Personnel Office's normal procedure and Audette's careful adherence to the rules was credible. (R. 20.) Jean Bouchard agreed, and stated that she had known Audette all her life and knew that Audette "would have went over anything with anybody over and over again until they understood." (R. 20.) Bouchard further stated that, as a City employee, "I have about 5 pension booklets, the ten year guarantee is explained in the booklet." (R. 20.) Jeanne Muto-Kyle stated that although she believed the forms were ambiguous generally, as to Mary, it was not ambiguous that Mary chose the Ten Year Guarantee. (R. 20.) Jack O'Donnell stated that he had retired "under Pat Audette and I think I went down there about 3 or 4 times," and that it took Audette two weeks to get all the paperwork prepared for their first meeting "so I could understand it better when I got there." (R. 20.)
The Board then voted to unanimously deny Donald's request to overturn the City of Warwick's decision to cease payments based on Mary's election of the Ten Year Guarantee. (R. 21.) *Page 11 
On December 16, 2009 the Board issued its decision, detailing its findings of fact and conclusions of law.
Donald appealed to the Superior Court. Donald argues that the Board's decision is arbitrary and capricious, G. L. 1956 § 42-35-15(g)(6) and clearly erroneous in view of the evidence on the whole record, § 42-35-15(g)(5). The City disagrees, arguing that the evidence strongly supports the Board's decision that Mary knowingly chose the Ten Year Guarantee after the "extraordinary steps" taken by the Personnel Office to ensure Mary's understanding of her options.
 II Standard of Review
Appellant initiated an administrative appeal under § 42-35-15 of the Administrative Procedures Act. Section 42-35-15(g) prescribes this Court's standard of review:
 "The court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court may affirm the decision of the agency or remand the case for further proceedings, or it may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
 (1) In violation of constitutional or statutory provisions;
 (2) In excess of the statutory authority of the agency;
 (3) Made upon unlawful procedure;
 (4) Affected by other error or law;
 (5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
 (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion." *Page 12 
Thus, "factual findings of the administrative agency are entitled to great deference." Champlin's Realty Assoc. v. Tikoian,989 A.2d 427, 437 (R.I. 2010). In reviewing an agency decision, this Court is limited to an examination of the certified record in deciding whether the agency's decision is supported by substantial evidence. Ctr. for Behavioral Health, Rhode IslandInc. v. Barros,710 A.2d 680, 684 (R.I. 1998) (citations omitted). Substantial evidence has been defined as "such relevant evidence that a reasonable mind might accept as adequate to support a conclusion, and means more than a scintilla but less than a preponderance."Wayne Distrib. Co. v. Rhode Island Comm'n for Human Rights,673 A.2d 457, 459 (R.I. 1996) (citing Newport ShipyardInc. v. Rhode Island Comm'n for Human Rights,484 A.2d 893, 896 (R.I. 1994)). If "substantial evidence exists," this Court is required to uphold the agency's conclusions.Envtl. Scientific Corp. v. Durfee,621 A.2d 200, 208 (R.I. 1983). This is so even if this Court might be inclined to view the evidence differently and draw inferences different from those the agency drew below. BarringtonSch. Comm. v. Rhode Island Labor Relations Bd.,608 A.2d 1126, 1138 (R.I. 1992).
This Court may not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact.Interstate Navigation Co. v. Div. of Pub. Utils. Carriers ofRhode Island,824 A.2d 1282, 1286 (R.I. 2003) (citations omitted). Therefore, this Court will "reverse factual conclusions of administrative agencies only when they are totally devoid of competent evidentiary support in the record." Baker v. Dept. of Employment Training Bd. ofReview, 637 A.2d 360, 363 (quoting Milardo v. CoastalRes. Mgmt. Council, 434 A.2d 266, 272 (R.I. 1981)). *Page 13 
 III ANALYSIS
Appellant Donald Cramer contends that the evidence does not support the Board's finding that Mary chose the Ten Year Guarantee. Appellant argues that Jordan's testimony of office protocol and of Audette's fastidious nature cannot support a finding that Mary did in fact meet with Personnel Office staff and make an informed decision. Appellant further argues that the Board could not find that Mary knowingly chose the Ten Year Guarantee because the forms were confusing and ambiguous, and that as a matter of law, the Court must interpret the forms.
"It is a `simple but fundamental rule of administrative law' that an `agency must set forth clearly the grounds on which it acted.'" Town of Burrillville v. Pascoag Apt. Assoc.,950 A.2d 435, 451 (R.I. 2008) (quoting Atchison,Topeka Santa Fe Ry. Co. v. Wichita Bd. of Trade,412 U.S. 800, 807 (1973)). This fundamental rule is codified in § 42-35-12, which states that "[f]indings of fact, if set forth in statutory language, shall be accompanied by a concise and explicit statement of the underlying facts supporting the findings." Furthermore, "[a]n administrative decision that fails to include findings of fact required by statute cannot be upheld."Sakonnet Rogers, Inc. v. Coastal Res. Mgmt. Council,536 A.2d 893, 896-97 (R.I. 1988) (citing East Greenwich YachtClub v. Coastal Res. Mgmt. Council,118 R.I. 559, 568, 376 A.2d 682, 687 (R.I. 1977)).
In the instant matter, the Board's written decision rests, in relevant part, on the following enumerated findings of fact:
 "(4) On April 4, 1990, Ms. Cramer met with a representative from the city's personnel department to inquire about retirement benefits. *Page 14 
 (5) The usual practice is for prospective retirees to be informed of the amounts they would receive as an annuity and the different forms of annuity available.
 (6) The various forms of a survivor's annuity that were available to Ms. Cramer in 1990 included a 100% option, a 75% option, a 50% option and a form known as a ten-year guarantee.
 (7) On April 20, 1990, Ms. Cramer contacted the Personnel Department indicating that she was interested in the ten-year guarantee form of annuity. In Ms. Cramer's file was a handwritten note stating that she was interested in the ten-year guarantee even though her husband was a smoker and that she would probably outlive him.
 (9) On 8/28/90, Ms. Cramer signed her preliminary application for retirement to be effective on 10/1/1990, selecting the Optional Form. On the same date she also signed a form indicating she was not interested in the optional form of annuity.
 (11) On 9/20/1990, Ms. Cramer signed her final application for retirement indicating her desire to elect the Option Form of annuity.
 (13) On November 20, 1990, a letter was sent to Ms. Cramer with her first pension check in the amount of $332.07. This was the same amount indicated on various forms previously provided to Ms. Cramer that showed the amount of the monthly benefit for the form of the retirement she had selected.
 (14) By accepting the ten-year guarantee form of annuity, the retiree received a greater monthly sum than she would have had she instead chosen one of the other optional forms of annuity that would have provided survivor benefits to her spouse until his death.
 (15) At no time subsequent to receiving her pension check did either Ms. Cramer or her husband (petitioner) question the amount of benefit being paid."
These findings, based on the testimony and the evidence presented, lead the Board to find in paragraph 4 of its Conclusions "that it is unambiguous that it was the clear intention of Ms. *Page 15 
Cramer to accept the ten-year form of annuity when she retired from the city in 1990." The Board further found that "it is also clear that Ms. Cramer fully understood what the consequences were of accepting this form of payment." Accordingly, the Board found that "petitioner is not entitled to an annuity pension under the ordinances and rules of the pension plan."
Appellant contends that the evidence cannot support the findings that Mary met with Personnel Office staff and was fully informed of her options. Appellant attacks the testimony of Deputy Personnel Director Jane Jordan because Jordan did not personally observe Patricia Audette speaking with Mary and handing Mary forms. Regardless of whether the contested testimony amounted to hearsay given Jordan's lack of personal observation, the Rhode Island Supreme Court has held that hearsay testimony is admissible in administrative hearings. DePasquale v. Harrington,599 A.2d 314, 316 (R.I. 1991). In DePasquale, our Supreme Court stated that:
 "[t]he admission of hearsay evidence in an administrative forum is reflective of the traditional division of function between judge and jury. Many of the rules surrounding the exclusion of hearsay in jury trials are meant to prevent juries, uninitiated in the evaluation of evidence, from hearing unreliable or confusing testimony and rendering a verdict based on such evidence. See McCormick on Evidence, §§ 351-352 at 1006-12. Such protection is far less necessary when evidence is presented to a judge sitting without a jury or, as in this case, a hearing officer with substantial expertise in the matters falling within his or her agency's jurisdiction. Id. (citing 2 Charles H. Koch, Jr., Administrative Law and Practice, § 5.52[3](a) (2d ed. 1997) ("The general rule remains that hearsay evidence is admissible in administrative hearings.")). "Administrative hearings are not held to the same evidentiary standards as criminal or even judicial civil proceedings. Hearsay is quite acceptable in administrative hearings." In re Cross, 617 A.2d 97, 102-103 (R.I. 1992) (citing Craig v. Pare, 497 A.2d 316, 320 (R.I. 1985))."
Thus, even if considered hearsay, Jordan's testimony was nonetheless properly before the Board. Jordan's testimony, however, was not the only evidence to support the Board's finding *Page 16 
that Mary knowingly chose the Ten Year Guarantee. Board members Jack O'Donnell and Jean Bouchard testified to Audette's fastidious behavior. Evidence was also adduced on the routine practices of the Personnel Office. Jordan testified to the practice of having a prospective retiree come in to the office to discuss options with Personnel staff, having the staff explain each option in detail, and using the forms used in Mary's case. Board member Jean Bouchard corroborated Jordan's testimony that booklets explaining the pension system were routinely distributed amongst City employees.
The Board's consideration of and reliance on this evidence was warranted. Rhode Island Rule of Evidence 406 permits admission of evidence of habit or routine practice because such evidence "is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice." R.I.R. Evid. 406.
Appellant also argues that the Board should have found the contract ambiguous. Appellant contends that such a finding would permit the Board to inquire into Mary's intent, and that the evidence unequivocally shows that Mary intended to secure the Optional Form, which would provide Appellant with payments for the remainder of his life.
Whether a contract is ambiguous is a question of law.Westinghouse Broad. Co. v. Dial Media, Inc.,122 R.I. 571, 579, 410 A.2d 986, 991 (1980). However, "the intent of the parties to an ambiguous contract is a question of fact."Cazabat v. Metro. Prop. Cas. Ins. Co., No. KC-99-0544, 2000 WL 1910089 (Apr. 24, 2000) (citingWestinghouse,122 R.I. at 579-80, 410 A.2d at 991 (citations omitted)). The Board did not explicitly state that it found the pension forms ambiguous. The Board concluded that Mary did, however, unambiguously and knowingly elect the Ten Year Guarantee. The evidence to support this conclusion was not undisputed. The Board's consideration of the testimony of James Cramer and the Affidavit of Donald Cramer as *Page 17 
evidence of Mary's intent to choose the Optional Form was valid given the DePasquale rule on hearsay in the administrative context. 599 A.2d at 316. Further, Appellant correctly asserts that the evidence of the City's new pension form — which, unlike Mary's forms, accounts for the Ten Year Guarantee separately from the Optional Form — is relevant towards a finding of ambiguity. (Appellant's Ex. 7.) Rhode Island Rule of Evidence 407 permits evidence of subsequent remedial measures as evidence of a previously actionable condition.
Although there is some competent evidence which the Board could rely upon to find that Mary intended to choose the Optional Form, this Court may not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. InterstateNavigation Co., 824 A.2d at 1286 (citations omitted). The record below is not "totally devoid of competent evidentiary support" for the finding that Mary knowingly chose the Ten Year Guarantee.Baker, 637 A.2d at 363. In fact, there was abundant evidence presented during the hearing to support the Board's conclusion Mary knowingly elected the Ten Year Guarantee. The Board was in the best position to discredit the testimony of Mary's family members concerning Mary's predictions for her retirement. The Board was in the best position to decide whether the typewritten references to the Ten Year Guarantee existed on the forms when Mary visited the Personnel Office, and to match Mary's signature on the note stating "I opted for the second — (ten-year guarantee)" with Mary's signature on multiple other forms. Further, the Board was presented with uncontradicted evidence of both the Personnel Office's and Audette's routine business practices to support the conclusion that Mary was fully informed of her options. Consequently, there is reliable and competent evidence in the record to support the Board's finding that Mary elected the Ten Year Guarantee. *Page 18 
 IV CONCLUSION
After a thorough review of the entire record, this Court finds that the Board's decision was not clearly erroneous in light of the reliable, probative, and substantial evidence on the whole record; or affected by error of law. This Court further finds that the Board's decision was neither arbitrary nor characterized by an abuse of discretion. Substantial rights of Appellant have not been prejudiced. Accordingly, this Court affirms the Board's decision.
Counsel for Appellee City of Warwick shall submit the appropriate judgment for entry.